# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| FULTON BOILER WORKS, INC., <br>       Plaintiff, <br>       -against- <br> AMERICAN MOTORISTS INSURANCE COMPANY; AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY; ONEBEACON INSURANCE COMPANY, as successor to Commercial Union Insurance Company, EMPLOYERS INSURANCE COMPANY OF WAUSAU; TRAVELERS CASUALTY AND SURETY COMPANY; and NATIONWIDE MUTUAL INSURANCE COMPANY, <br>       Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Civil Action No. 06-CV-1117 (GTS/DEP) |
| AMERICAN MOTORISTS INSURANCE COMPANY; AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, and ONEBEACON INSURANCE COMPANY, as successor to Commercial Union Insurance Company, <br>       Third-Party Plaintiffs, <br>       - against - <br> EMPLOYERS INSURANCE COMPANY OF WAUSAU; TRAVELERS; and NATIONWIDE MUTUAL INSURANCE COMPANY, <br>       Third-Party Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |  |

## BRIEF IN SUPPORT OF FULTON BOILER WORKS, INC.'S MOTION TO ALTER OR AMEND THE DECEMBER 9, 2011 JUDGMENT

**McCARTER & ENGLISH, LLP**
245 Park Avenue, 27th Floor
New York, NY 10167
Phone: 212.609.6800
Fax: 212.609.6921
Attorneys for Plaintiff
Fulton Boiler Works, Inc.

MEI 12773184v.2

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT...........................................................................................................1

    I.    Workers Compensation Records Support Fulton's Position That It Purchased All Forms of Coverage from the Same Carrier.....................................................2

    II.    The Parties Have Different Motivations in the Underlying Cases. .........................3

    III.    Fulton's Proposed Defense Strategy Is In Its Best Interest.....................................5

CONCLUSION.......................................................................................................5

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Atl. States Legal Found., Inc. v. Rainbow Alliance for a Clean Env't,
    841 F. Supp. 51 (N.D.N.Y. 1993) ...................................................................1

Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co.,
    No. 5:06-CV-1117, 2010 U.S. Dist. LEXIS 28756 (N.D.N.Y. Mar. 25, 2010) ...................3, 4

Nat'l Union Fire Ins. Co. v. Greenwich Ins. Co.,
    No. C07-2065-JCC, 2009 U.S. Dist. LEXIS 12644 (W.D. Wash. Feb. 2, 2009) ......................4

Schwartz v. Twin City Fire Ins. Co.,
    539 F.3d 135 (2d Cir. 2008) ....................................................................1

Steadfast Insurance Co. v. Purdue Frederick Co.,
    No. X08CV020191697S, 2005 Conn. Super. LEXIS 3472 (Conn. Super. Ct. Dec. 6,
    2005) ..........................................................................................4

OTHER AUTHORITIES

Fed. R. App. P. 4(a)(4) .............................................................................1

Fed. R. Civ. P. 56(c) ..............................................................................3, 5

Fed. R. Civ. P. 59(e) ..............................................................................1, 5

ME1 12773184v.2

## PRELIMINARY STATEMENT

Fulton respectfully requests that the Court alter or amend its December 9, 2011 Judgment, including its supporting Memorandum–Decision and Order ("Memorandum" or "Mem."), in light of errors regarding: (1) its determination that workers' compensation records do not support Fulton's contention that it purchased all coverages from a single insurance company in any given year; (2) the Court's comment that the parties' motivations in defending the underlying asbestos cases are aligned; and (3) its comment that Fulton's defense strategy is not in the best interest of the company. Fulton is not necessarily asking the Court to amend its holdings (unless the Court chooses to do so *sua sponte*), but asks the Court instead to modify its Judgment and Memorandum in recognition of a limited number of erroneous findings.

In connection with point (3), in particular, Fulton finally tried its first underlying asbestos case during the long pendency of the competing summary judgment motions on indemnity. The trial resulted in a complete victory for Fulton. Accordingly, there is objective evidence supporting Fulton's view that the cases should have been defended more vigorously and more cases should have been taken to trial.

## ARGUMENT

Federal Rule of Civil Procedure 59(e) permits the Court to "alter or amend" any judgment entered. The Second Circuit has held that there are few limitations on the Court's ability to alter or modify its judgment, which is largely a matter of discretion. Schwartz v. Twin City Fire Ins. Co., 539 F.3d 135, 153 (2d Cir. 2008). The Court may revise the Judgment in light of new evidence. Atl. States Legal Found., Inc. v. Rainbow Alliance for a Clean Env't, 841 F. Supp. 51, 53 (N.D.N.Y. 1993). A motion pursuant to Federal Rule of Civil Procedure 59(e) tolls the time for appeal. Fed. R. App. P. 4(a)(4).

I.     **Workers Compensation Records Support Fulton's Position That It Purchased All Forms of Coverage from the Same Carrier.**

In his Affidavit of July 26, 2010, Ronald Palm, Sr., testified that Fulton purchased primary commercial liability coverage each year since the company's founding in 1949. Aff. of Ronald Palm, Sr., Dkt. No. 191, at ¶¶ 2-3. Mr. Palm also testified that Fulton always bundled all its various coverages, including liability and workers' compensation, with the same insurance company in any given year. Id. at ¶ 6. His Affidavit incorporated records from the Office of the General Counsel, New York State Workers Compensation Board reflecting claims made under workers' compensation policies issued to Fulton. Id. at ¶ 7 & Ex. 1.

In its Memorandum, the Court concluded those records conflict with Fulton's position that Fulton purchased all its coverages from the same carrier, finding the argument:

> undercut by the workers compensation records relating to 1976-1979. The records show that Fulton had workers compensation coverage through Firemen's Insurance of New Jersey in 1976 and Standard Fire Insurance Company in 1977-1979. However, the parties agree that Travelers provided general liability insurance to Fulton from October 1976 through October 1980. This is counter to Fulton's alleged practice of purchasing all forms of insurance from the same insurer.

See Mem. at 13-14. In a footnote, the Court stated "there is no indication that Firemen's Insurance of New Jersey and/or Standard Fire Insurance Company were predecessors of Travelers." Id. at 14 n.12.

Standard Fire, however, operated as an affiliate of Travelers' predecessor, Aetna, which issued the relevant liability coverage to Fulton from October 1976-80.[1] Best's Insurance Reports indicate Standard Fire "has been controlled by the Aetna Life & Casualty group since 1924." A.M. BEST COMPANY, 1993 BEST'S INSURANCE REPORTS – PROPERTY-CASUALTY  53-55 (1993)

---

[1] The Court already has found Aetna was "a predecessor of Travelers." See Mem. at 13.

2

(see Exhibit A).   Aetna's website confirms the corporate relationship between Aetna and Standard Fire.[2]

Moreover, the Firemen's records do not contradict Fulton's argument.   As indicated above, Aetna/Travelers issued policies to Fulton beginning in October 1976.  See Mem. at 14. The workers' compensation records incorporated into the Palm Affidavit reflect that an injury implicating the Firemen's policy occurred on June 13, 1976.  Aff. of Ronald Palm, Sr., Dkt. No. 191, at Ex. 1.  The triggered Firemen's policy, therefore, fell within the October 1975 through October 1976 policy period immediately preceding Travelers.[3]

In short, there is nothing to suggest that the workers' compensation records are "counter to Fulton's alleged practice of purchasing all forms of insurance from the same insurer."  In fact, the records bolster Fulton's argument.  The Court should not have made its determination regarding the workers' compensation records in light of the summary judgment standard.  See, e.g., Fed. R. Civ. P. 56(c).

## II.    The Parties Have Different Motivations in the Underlying Cases.

In analyzing whether Fulton met its burden to demonstrate prejudice, the Court stated the insurers "have the same financial interest as Fulton in mitigating all costs related to the Asbestos Claims."  See Mem. at 18.    That is not correct.

Pursuant to their policies, the insurers have an obligation to defend and indemnify Fulton only until exhaustion of their policy limits through payment of claims, which occurs by payment of indemnity for settlements or judgments against Fulton, but not for defense costs.  Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co., No. 5:06-CV-1117, 2010 U.S. Dist. LEXIS 28756,

---

[2] See http://www.aetna.com/about-aetna-insurance/aetna-corporate-profile/aetna-history/index.html.  (See Exhibit B).

[3] Although the record has an October 7, 1976 date, the date of the accident is relevant for determining the implicated policy.

at *9-*10 (N.D.N.Y. Mar. 25, 2010).  Until they exhaust, the insurers have an obligation to fund 100% of Fulton's defense costs.  Id.  Thus, the insurers have an interest in settling cases quickly to erode their policy limits rather than spending defense costs on a potentially expensive trial. See Nat'l Union Fire Ins. Co. v. Greenwich Ins. Co., No. C07-2065-JCC, 2009 U.S. Dist. LEXIS 12644 (W.D. Wash. Feb. 2, 2009) (stating "the primary insurer with a duty to defend and policy limit of $ 1 million … had an incentive to settle the case early and minimize its defense costs") (see Exhibit C).

As stated in prior submissions, Fulton contends that the nature of, and limited market for, Fulton's boilers makes potential exposure to asbestos from a Fulton boiler remote.  See June 29, 2010 Certification of Brian J. Osias, Esq. ("June 29, 2010 Osias Cert."), Dkt. No. 174, Ex. 2 at 21:4-23; Ex. 3 at ¶¶ 5-6; see also Mem. at 6 n.6.  As a result, the vast majority of underlying plaintiffs have weak claims against Fulton.  See June 29, 2010 Osias Cert., Dkt. No. 174, Ex. 3 at ¶¶ 6-8.  By not settling, Fulton seeks to deter future meritless lawsuits and avoid being viewed as an easy, low-risk target.  See Mem. at 6 n.6.  Thus, unlike the insurers, Fulton has an interest in preserving the policy limits and mounting a strong case to defeat liability.

The Court should, at a minimum, recognize the potentially competing interests of Fulton and the insurers, see Steadfast Insurance Co. v. Purdue Frederick Co., No. X08CV020191697S, 2005 Conn. Super. LEXIS 3472, at *1-2 (Conn. Super. Ct. Dec. 6, 2005) (identifying conflict between policyholder that believes it has strong defenses to liability and insurer that wants to "control settlement so as to exhaust the limits of liability under the policy and terminate its duty to defend") (see Exhibit D), particularly in light of the summary judgment standard.

4

**III.    Fulton's Proposed Defense Strategy Is In Its Best Interest.**

Fulton respectfully requests that the Court remove the statement in footnote fourteen of its Memorandum that "Fulton's strict 'no-settle' policy may have been legally unrealistic and ultimately not in the company's best interest." See Mem. at 18 n.14. Fulton has never suggested that it has a "strict no-settle policy," but acknowledges that it would prefer that most cases should be tried.[4] Indeed, the single underlying case that recently went to trial lends support to Fulton's preferred strategy because the jury found Fulton had no liability.[5] See January 6, 2012 Affidavit of Brian J. Osias, Ex. 1. In any event, the Court's statement finds no support in the record. See Fed. R. Civ. P. 56(c)(1)(A) (requiring record support for any factual assertion on summary judgment). Certainly more than one case in over twenty years should have been taken to trial by the insurers.[6]

## CONCLUSION

Fulton respectfully requests the Court grant its motion to alter or amend the Judgment pursuant to Federal Rule of Civil Procedure 59(e) consistent with the foregoing.

By: /s/ Brian J. Osias
Gita F. Rothschild (Bar Roll # 514138)
Brian J. Osias  (Bar Roll # 514139)
McCARTER & ENGLISH, LLP
245 Park Avenue, 27th Floor
New York, NY 10167
Phone: 212.609.6800
Fax: 212.609.6921
Attorneys for Plaintiff
Fulton Boiler Works, Inc.

Dated:  January 6, 2012

---

[4] Fulton respectfully suggests that the Court should not label Fulton as "sophisticated" on the one hand, but then say that its settlement strategy should be disregarded on the other.

[5] Fulton did not update the Court on this development in light of the June 27, 2011 Text Order (Dkt. No. 234) barring further submissions on the parties' summary judgment motions.

[6] As the Court is aware, Fulton's position is that the insurers' "strict always settle" strategy over the course of twenty years has created a prejudicial, litigation environment that the insurers are now estopped to deny.  It has argued that prejudice must be presumed under these circumstances.  Fulton respectfully believes that the Court erred in finding no prejudice as a matter of law in light of the summary judgment standard.

# EXHIBIT A

**AETNA LIFE & CASUALTY GROUP—FARMINGTON CASUALTY COMPANY—Continued**

## HISTORY

This company was incorporated August 24, 1982 under the laws of Connecticut. It began business on October 1, 1982.

Capital paid up is $3,000,000, which consists of 1,000 shares of common stock at a par value of $3,000 per share. The company has 1,500 shares authorized.

## MANAGEMENT

All of the outstanding capital stock is owned by The Aetna Casualty and Surety Company, Hartford, Connecticut, the lead commercial lines company of the Aetna Life and Casualty Group. Administration of its affairs is under the same general management as the parent ultimate company, Aetna Life and Casualty Company.

Officers: President, David A. Kocher; senior vice presidents, Patrick W. Kenny; vice president and corporate controller, Robert E. Broatch; vice president and corporate auditor, Walter N. Coleman, vice president of finance and treasurer, Robert H. Kullas; vice president and senior corporate actuary; Brian E. Scott; vice presidents; William J. Boornazian, John J. Dwyer, John M. Purple, Ronald P. Stoeppelwerth; secretary, Sandra A. Williams.

Directors: William H. Boornazian, William S. Brown, Jr., John J. Dwyer, Richard E. Earley, Timothy A. Holt, Joseph P. Kiernan, David A. Kocher, Elaine A. Sarsynski, Brian E. Scott.

## OPERATIONS

Charter powers authorize the writing of multiple line insurance coverages.

Effective January 1, 1991, the Aetna Life and Casualty Pool was terminated and replaced with two intra-divisional pools, one for commercial lines and the other for personal lines. This company is currently a 0% participant in the commercial lines pool which is led by The Aetna Casualty and Surety Company.

An examination of the financial condition is being made as of December 31, 1987 by the Insurance Department of Connecticut, California, Georgia and Oklahoma. An independent audit of the company's affairs through December 31, 1992 was conducted by KPMG Peat Marwick. An evaluation of reserves for unpaid losses and loss adjustment expenses was made as of December 31, 1992 by Brian E. Scott, FCAS, MAAA, vice president and senior corporate actuary.

Territory. The company is licensed in DC and all states.

Major Direct Premium Writings by State ($000): New York, $71,239 (17.77%); Pennsylvania; $40,995 (10.2%); Connecticut; $30,240 (7.5%); Massachusetts, $24,358 (6.0%); California, $23,769 (5.9%); and 46 other jurisdictions, $212,113 (52.7%). Aggregate other alien, $1 (0.0%).

### 1992 Premiums and Losses by Kind of Insurance ($000)

| Kinds of Insurance | Direct Premiums Written | Rein-surance Assumed | Net Premiums Written | % Net Premiums Written | Net Premiums Earned | Unpaid Losses & Loss Exp. | Loss Inc. To Prem. Earned |
|---|---|---|---|---|---|---|---|
| Workers' Comp. | 114,717 | 71,430 | 71,430 | 30.7 | 67,203 | 261,718 | 94.0 |
| Com'l MultiPeril | 235,305 | 51,498 | 51,498 | 22.1 | 50,442 | 91,007 | 57.6 |
| Other Liability | 2,554 | 40,682 | 40,682 | 17.5 | 40,613 | 162,498 | 52.8 |
| Auto Liability | 27,180 | 31,116 | 31,116 | 13.4 | 30,649 | 62,232 | 56.0 |
| Auto Physical | 9,171 | 9,270 | 9,270 | 4.0 | 9,044 | 1,306 | 47.1 |
| Fidelity | | 5,712 | 5,712 | 2.5 | 5,468 | 4,965 | 11.5 |
| Fire | 6,011 | 5,381 | 5,381 | 2.3 | 5,536 | 5,377 | 55.8 |
| Surety | 4,438 | 4,438 | 4,438 | 1.9 | 4,931 | 5,416 | 4.2 |
| Inland Marine | 3,825 | 4,416 | 4,416 | 1.9 | 4,345 | 826 | 36.5 |
| Allied-Lines | 802 | 3,029 | 3,029 | 1.3 | 3,238 | 4,280 | 133.6 |
| Products Liability | 484 | 2,338 | 2,338 | 1.0 | 2,607 | 11,282 | 396.7 |
| All Other | 2,659 | 3,497 | 3,497 | 1.5 | 2,256 | 12,263 | |
| Totals | 402,714 | 232,807 | 232,807 | 100.0 | 226,697 | 653,672 | 70.0 |

## REINSURANCE

The company is covered by joint reinsurance arrangements that are maintained by the lead member of the pool, The Aetna Casualty and Surety Company, which is its sole reinsurer.

The larger amounts recoverable from reinsurers were $514.9 million, Aetna Casualty & Surety Company, an affiliate (318% of PHS). The total amounts recoverable from reinsurers were $137.0 million on unpaid losses, $258.1 million on incurred but not reported losses and $119.8 million on unearned premiums.

## UNDERWRITING EXPERIENCE

| | | Loss Ratios | | | Exp Ratios | | | |
|---|---|---|---|---|---|---|---|---|
| Year | NPE/ ($000) | Pure Losses | LAE | Loss &/ LAE | Net Com | Total Exp | Div Pol | *Comb. Ratio |
| 1988 | 67,395 | 64.4 | 15.7 | 80.1 | 14.0 | 14.4 | 28.4 | 109.8 |
| 1989 | 67,325 | 67.8 | 17.4 | 85.2 | 13.9 | 14.6 | 28.5 | 115.1 |
| 1990 | 63,762 | 65.3 | 18.2 | 83.4 | 13.3 | 15.9 | 29.1 | 113.7 |
| 1991 | 252,618 | 65.6 | 19.6 | 85.2 | 10.5 | 18.8 | 17. | 115.7 |
| 1992 | 226,697 | 70.0 | 26.4 | 96.5 | 11.4 | 20.3 | 31.7 | 129.6 |

* Combined loss, expense & dividend to policyholders ratio.

## COMPARATIVE FINANCIAL AND OPERATING EXHIBIT

All figures except ratios in thousands

| | | | FINANCIAL ($000) | | | | |
|---|---|---|---|---|---|---|---|
| Year | Best's Modifier | FPI | Premiums Written | Net Premiums Written | Pre-Tax Operating Income | Total Admitted Assets | Policy-holders' Surplus |
| 1988 | A | P | 82,073 | 67,776 | 2,975 | 154,589 | 31,587 |
| 1989 | A | P | 150,458 | 65,365 | 1,224 | 166,438 | 32,862 |
| 1990 | A | P | 225,566 | 62,512 | 2,937 | 167,878 | 34,416 |
| 1991 | A | P | 319,882 | 261,202 | 19,931 | 876,551 | 154,897 |
| 1992 | A | P | 402,714 | 232,807 | -7,930 | 905,813 | 161,728 |

| | | Profitability Tests | | Leverage Tests | | Liquidity Tests | |
|---|---|---|---|---|---|---|---|
| Year | Combined Ratio | Return on NPE | Return on PHS | NPW to PHS | Net Leverage | Gross Leverage | Current Liquidity | Quick Liquidity |
| 1988 | 109.8 | 4.4 | 10.3 | 2.1 | 6.0 | 6.0 | 108.4 | 17.9 |
| 1989 | 115.1 | 1.3 | 4.2 | 2.0 | 6.1 | 6.1 | 106.9 | 11.6 |
| 1990 | 113.7 | 4.6 | 4.8 | 1.8 | 5.7 | 5.7 | 110.7 | 24.2 |
| 1991 | 115.7 | 7.9 | 52.7 | 1.7 | 6.4 | 6.4 | 106.5 | 21.0 |
| 1992 | 129.6 | -3.5 | -4.4 | 1.4 | 6.0 | 6.0 | 108.4 | 12.5 |
| 1992 Best's Adjusted Tests | | 1.0 | | .40 | 4.7 | 118.6 | 19.3 |

◆

## Aetna Life & Casualty Group

# THE STANDARD FIRE INSURANCE COMPANY

151 Farmington Avenue, Hartford, CT 06156

Tel:203-273-0123 · Telefax: 203-273-6348 · AMB#: 02002  NAIC: 19070

### 1993 BEST'S RATING

Based on our current opinion of the consolidated financial condition and operating performance of the property/casualty members of the Aetna Personal Lines Pool, which operate under a business pooling arrangement (since January 1, 1991), each pool member is assigned a Best's Rating of A (Excellent). The company is assigned the Financial Size Category of Class X, which is the Financial Size Category of the pool. Refer to the Preface for a complete explanation of Best's Rating system and procedure. Rating Effective June 28, 1993.

### RATING RATIONALE

The Aetna Life and Casualty Company and its subsidiaries collectively rank as the eighth largest property/casualty underwriter in the country, with $5.0 billion in net premiums supported by $4.5 billion in surplus at year-end 1992. Affirmation of the property/casualty ratings reflects, among other factors detailed below, planned capital support to be provided by the parent holding company to insulate the two property/casualty intercompany pools from dividend pressures from the parent in the near future or from having to fund the sizable exposures to problem mortgage loans held by its life/health affiliates.

In that regard, Aetna Life and Casualty Company plans to suspend internal dividends from the property/casualty operations in 1993 and 1994 following the extraordinary dividend of $1.1 billion paid to the parent from the Commercial Lines Pool in November 1992. This dividend was associated with proceeds generated from the sale of American Reinsurance Company. Subsequent to the sale, the parent contributed $500 million of the proceeds into the life/health group to further bolster its capital base to support its business expansion strategies as well as the increased level of problem mortgages. Two-thirds of the remaining $600 million of sale proceeds, which continue to be held at the holding company, combined with Aetna's recently announced $500 million shelf registration, provides the holding company additional financial flexibility to pay external stockholder dividends through 1994. In addition, subject to various approvals, Aetna plans to reallocate $300 million of capital from the Personal Lines Pool to the Commercial Lines Pool in the third quarter to bring their respective capital resources more in line with the underwriting commitments and asset exposures.

Aetna's Personal Lines Pool rating affirmation reflects management's refocused personal lines underwriting strategies, its strong market recognition and presence in the northeast, and its good capitalization. These positive rating factors are derived from business and expense reduction initiatives started in 1991 geared towards withdrawing from, or reducing, its exposure to personal automobile insurance in states deemed to have poor operating or regulatory environments. These initiatives have positioned Aetna as a more focused, regional provider of automobile insurance. Concurrently, Aetna has established a separate market identity for its homeowners business, and contrary to its automobile strategy, is committed on a national basis. These positive rating factors are offset somewhat by the adverse market impact that the automobile downsizing actions are having on its core homeowners book. However, A.M. Best expects that these impacts will subside as Aetna's Personal Lines Pool maintains its commitment to its

*Refer to inside back cover for explanation of items*

**AETNA LIFE & CASUALTY GROUP—THE STANDARD FIRE INSURANCE COMPANY—Continued**

independent agents and emerges from this transition period. Because of its ongoing downsizing initiatives, the Personal Lines Pool maintains very strong capitalization, with $1.6 billion of investments, down nearly 30% from prior year, supported by $883 million in surplus at year-end 1992.

### OPERATING COMMENTS

The underwriting results of the Aetna Personal Lines Pool, led by The Standard Fire Insurance Company, deteriorated modestly by approximately 5 points due in part to catastrophe losses incurred in 1992. Because of Aetna's dramatic downsizing of its personal automobile business in unprofitable states, with an overall reduction of nearly 50% in its overall premiums, Aetna's statutory combined ratio of 122 in 1992 has been distorted considerably reflecting unfavorable loss and expense absorption. A more informative indicator of Aetna's progress in reducing its unprofitable automobile business is the pool's reduction in underwriting losses from $277 million in 1991 to $230 million in 1992. The pool returned to positive operating earnings with an improved, but modest, pre-tax return on revenue of 0.9% in 1992.

Capitalization for the Personal Lines Pool improved significantly in 1992, as policyholder surplus increased 4%, while exposures declined sharply. Underwriting leverage was reduced substantially, with premium leverage falling from 3.6x surplus at year-end 1991 to 1.8x at year-end 1992 and reserve leverage declining from 2.8x to 2.4x over this same time period. Given the effect of further sizable automobile business reductions in 1993 and 1994, maintenance of solid reinsurance protection against catastrophe losses on its homeowners book, and strong loss reserve position, the Aetna Personal Lines Pool can comfortably support the re-allocation of $300 million of its excess capital in 1993 to the Aetna Commercial Lines Pool mentioned in the Rating Rationale above.

The pool maintains sound liquidity, with invested assets that exceed its net liabilities by 12% in 1992. Negative operating cashflow of $289 million is reflective of sharply lower premiums noted above. The pool maintains aggressive investment leverage, with 64% of year-end surplus (96% of pro forma surplus following the extraordinary dividend noted above) invested in mortgage loans. Twenty-one percent of the pool's $562 million mortgage loan and real estate portfolio is classified as non-performing, with payments over 90 days past due on loans on properties or in the process of foreclosure. The majority of the pool's invested assets are invested in high quality bonds, with over 25% of its bond holdings invested in collateralized mortgage obligations (CMOs), almost all of which consists of sequential and planned amortization class bonds. These CMOs are subject to less prepayment risk and are backed by government agencies.

### ADMITTED ASSETS ($000)

| | Avg. Yield | 12/31/92 | 12/31/91 | '92% | '91% |
|---|---|---|---|---|---|
| Unaffiliated investments | | | | | |
| Cash & short-term invest. | 5.0 | 66,589 | 145,101 | 2.1 | 4.2 |
| Bonds | 7.3 | 1,526,487 | 1,719,439 | 48.6 | 50.2 |
| Preferred stock | | 64,795 | 68,105 | 2.1 | 2.0 |
| Common stock | 2.2 | 84,669 | 70,862 | 2.7 | 2.1 |
| Mortgage loans | 8.7 | 488,142 | 532,419 | 15.5 | 15.5 |
| Real estate, investment | 1.0 | 25,133 | 35,158 | 0.8 | 1.0 |
| Other investments | 9.9 | 277 | 303 | 0.0 | 0.0 |
| Accrued interest | | 44,425 | 37,734 | 1.4 | 1.1 |
| Total unaffil invest | 7.4 | 2,300,516 | 2,609,121 | 73.2 | 76.2 |
| Investments in affiliates | 0.8 | 562,196 | 535,669 | 17.9 | 15.6 |
| Real estate, offices | 1.0 | 5,611 | 5,832 | 0.2 | 0.2 |
| Premium balances | | 90,692 | 163,661 | 2.9 | 4.8 |
| Reinsurance funds | | 6,998 | | 0.2 | |
| Receivable from affiliates | | 108,652 | 85,926 | 3.5 | 2.5 |
| Other assets | | 67,913 | 25,948 | 2.2 | 0.8 |
| Total (statement) | | 3,142,579 | 3,426,157 | 100.0 | 100.0 |

### LIABILITIES, SURPLUS & OTHER FUNDS ($000)

| | 12/31/92 | 12/31/91 | '92% | '91% |
|---|---|---|---|---|
| Losses & adjustment exp | 1,575,535 | 1,775,139 | 50.1 | 51.8 |
| Commissions, taxes, exp | 61,164 | 63,946 | 1.9 | 1.9 |
| Unearned premiums | 456,524 | 613,770 | 14.5 | 17.9 |
| Reinsurance funds | 289 | 1,769 | 0.0 | 0.1 |
| Drafts and payables | 47,685 | 57,624 | 1.5 | 1.7 |
| Payable to affiliates | 12,933 | 3,785 | 0.4 | 0.1 |
| Other liabilities | 91,966 | 57,801 | 2.9 | 1.7 |
| Conditional reserve funds | 13,322 | 102 | 0.4 | 0.0 |
| Total liabilities (stmt) | 2,259,418 | 2,573,736 | 71.9 | 75.1 |
| Capital paid up | 2,500 | 2,500 | 0.1 | 0.1 |
| Assigned surplus | 535,972 | 535,972 | 17.1 | 15.6 |
| Unassigned surplus | 344,689 | 313,949 | 11.0 | 9.2 |
| Policyhrs' surplus (stmt) | 883,161 | 852,421 | 28.1 | 24.9 |
| Total | 3,142,579 | 3,426,157 | 100.0 | 100.0 |

### INVESTMENT DATA

% Distribution of Bonds by Maturity

| Bond Classification | Total Bonds | 0-1 | 1-5 | 5-10 | 10-20 | 20- | Yrs-Avg Maturity |
|---|---|---|---|---|---|---|---|
| Governments | 9.5 | 1.0 | 6.1 | 1.2 | 0.1 | 1.2 | 6 |
| States,terr&poss | 6.2 | 1.6 | 3.2 | 1.2 | 0.2 | 0.1 | 4 |
| Spec rev&asmt oblg | 43.2 | 1.0 | 6.0 | 7.2 | 19.0 | 9.9 | 14 |
| Public utilities | 6.1 | 2.4 | 3.0 | | | 0.6 | 4 |
| Industrial&misc | 35.0 | 11.8 | 13.8 | 0.8 | 5.2 | 3.4 | 6 |
| Total | 100.0 | 17.8 | 32.2 | 10.2 | 24.5 | 15.3 | 9 |

Bond Income: US Gov't 7.8%; US tax exempt 26.3%; Other Unaffiliated 65.9%.

Quality of Bond Portfolio: Investment Grade: US Gov't 8.4%; Class 1 - 82.5%; Class 2 - 6.8%. Non-Investment Grade: Class 3 - 1.7%; Class 4 - 0.5%; Class 6 - 0.2%.

Investments in Insurance Affiliates: Property/casualty common stockholdings include all 50,000 shares of Automobile Insurance Company of Hartford carried at $280,953,378; all 1,500 shares of Aetna Insurance Company carried at $43,196,363; all 1,000 shares of Aetna Insurance Company of Illinois carried at $24,611,138; and all 1,000 shares Aetna Personal Security Insurance Company carried at $12,643,733.

Investments in Non-Insurance Affiliates: Common stockholdings include all 400 shares of AB Properties Inc. carried at $68,061,720; 2,343,025 shares (83.7%) of U.S. Dollar Bond Fund carried at $13,673,039; 1,824,581 shares (98.8%) of American Income and Growth Fund carried at $11,719,276; 50 shares (50%) of Aetna Information Services carried at $11,061,499; 1,495,097 shares (92.9%) of U.S. Dollar Reserve Fund carried at $7,910,419; 500,925 shares (80%) of Municipal Securities Income Fund carried at $6,151,611; all 100 shares of Community Rehabilitation Investment Corporation carried at $3,068,641. Also reported as affiliated common stockholdings are 12 funds from various foreign countries carried at a total of $79,144,498.

### SUMMARY OF OPERATIONS 1992 ($000)

| Statement of Income | | Funds Provided from Operations | |
|---|---|---|---|
| Premiums earned | 1,321,361 | Premiums collected | 1,244,675 |
| Losses incurred | 952,613 | Losses paid | 1,091,713 |
| Loss adj exp incurred | 194,357 | Loss expenses paid | 195,461 |
| Undrw exp incurred | 418,581 | Undrw expenses paid | 415,325 |
| Adj for prior years | -76,235 | Adj for prior years | |
| Other deduct & inc | 1,871 | Other deduct & inc | -3,683 |
| Net underwrtg income | -169,825 | Funds from underwrtg | -461,507 |
| Investment income | 191,027 | Investment income | 189,896 |
| Investment expenses | 8,686 | Investment expenses | 6,740 |
| Income taxes | -70,644 | Income taxes | -39,383 |
| Net operating income | 83,160 | Funds from operations | -238,968 |

**Breakdown – Premiums Written & Other Underwriting Exp Incurred**

| | Premiums Written | Com-missions % | Oth Underw Expenses % |
|---|---|---|---|
| Direct | 948,460 | 111,769 | 11.8 | Salaries&rel txs | 78,482 | 6.7 |
| Assumed | 1,187,081 | 158,688 | 13.4 | Insur taxes, fees | 50,390 | 4.3 |
| Ceded | 971,426 | 85,094 | 8.8 | All others | 84,787 | 7.3 |
| Cost-net | | 19,558 | | | | |
| Net | 1,164,115 | 204,922 | 17.6 | Total other exp | 213,660 | 18.4 |

Reinsurance: Assumed from affiliates $1,117,583; Ceded to affiliates $743,591.

| Change in Policyholders' Surplus | | Change in Funds | |
|---|---|---|---|
| Net operating income | 83,160 | Funds from operations | -238,968 |
| Realized cap gains | 3,581 | Realized cap gains | -3,581 |
| Unrealized cap gains | -19,132 | Unrealized cap gains | |
| Cap & surp paid out | -30,000 | Cap & surp paid out | -30,000 |
| Change in cond'l res | -13,220 | Other fund changes | -42,480 |
| Other changes | -6,352 | Other changes | |
| Change in polhdrs' surp | 30,740 | Change in funds | -307,867 |

### HISTORY

This company was chartered under the laws of Connecticut on July 6, 1905 and began business March 26, 1910.

Paid-up capital of $2,500,000 consists of 20,000 common shares at $125 par value each. All authorized shares are outstanding.

### MANAGEMENT

The company has been controlled by the Aetna Life & Casualty group since 1924. Since January 1, 1991, direct stock ownership has been held by The Aetna Life and Casualty Company. Administration of its affairs is under the same general management as the parent company.

Officers: Chairman and president, Ronald E. Compton; group executives, Gary G. Benanav; Daniel P. Kearney, Patrick W. Kenny, David A. Kocher, James W. McLane; senior vice president and executive counsel, Stephen B. Middlebrook; senior vice presidents, Mary Ann Champlin (human resources), Elizabeth R. Krupnick (corporate affairs), John D. Lowenberg (information technology), Vanda D. McMurtry (federal government

**AETNA LIFE & CASUALTY GROUP---THE STANDARD FIRE INSURANCE COMPANY---Continued**

relations); vice president (finance) and treasurer, Robert H. Kullas; vice president and corporate controller, Robert E. Broatch; senior vice president and general counsel, Zoe E. Baird; vice president and director of internal audits, Walter N. Coleman; vice president and senior corporate actuary; Brian E. Scott; corporate secretary and counsel, Lucille M. Nickerson.

Directors: Charles F. Baird, Wallace Barnes, Ronald B. Compton (chairman), William H. Donaldson, Michael H. Jordan, Jack D. Kuehler, Bayless A. Manning, Frank R. O'Keefe, Jr., David M. Roderick.

## OPERATIONS

Underwriting facilities are maintained for the handling of virtually all property and casualty insurance coverages with the majority of business underwritten including full coverage personal automobile, homeowners, and workers' compensation lines. Business is marketed through independent agents and brokers with nearly one-half its personal lines writings concentrated in the Northeast. Virtually all commercial lines business underwritten is ceded to affiliates within the Aetna Commercial Lines Pool. Currently Aetna's personal property /casualty operations rank as the sixth largest underwriter of personal line in the United States.

Effective January 1, 1991, the Aetna Life & Casualty Pool was terminated and replaced with two intra-divisional pools, one for commercial lines and the other for personal lines. The Standard Fire Insurance Company and four other companion carriers pool their personal lines underwriting results. Current participations in the pool are as follows: The Standard Fire Insurance Company (75%); The Automobile Insurance Company of Hartford, Connecticut (20%); Aetna Insurance Company (3%); Aetna Personal Security Insurance Company (1%) and Aetna Insurance Company of Illinois (1%).

An examination of the financial condition was made as of December 31, 1987 by the Insurance Department of Connecticut, California, Georgia and Oklahoma. An independent audit of the company's affairs through December 31, 1992 was conducted by KPMG Peat Marwick. An evaluation of reserves for unpaid losses and loss adjustment expenses was made as of December 31, 1992 by Brian E. Scott, FCAS, MAAA, vice president and senior corporate actuary.

Territory: The company is licensed in D.C., Puerto Rico, Virgin Islands and all states.

Major Direct Premium Writing by State ($000): Pennsylvania, $150,624 (15.9%); Connecticut, $117,927 (12.4%); New York, $103,545 (10.9%); California, $94,474 (10.0%); Texas, $88,658 (9.3%); Florida, $64,881 (6.8%); and 47 other jurisdictions, $328,304 (34.6%). Aggregate other alien, $48 (0.0%).

### 1992 Premiums and Losses by Kind of Insurance ($000)

| Kinds of Insurance | Direct Premiums Written | Reinsurance Assumed | Net Premiums Written | % NPW | Net Premiums Earned | Net Unpaid Loss Res. | Loss Inc. To Prem. Earned |
|---|---|---|---|---|---|---|---|
| Auto Liability | 239,355 | 601,933 | 539,092 | 46.3 | 617,286 | 1,314,142 | 62.3 |
| Homeowners | 220,171 | 192,483 | 275,889 | 23.7 | 305,194 | 156,016 | 73.4 |
| Auto Physical | 110,253 | 278,243 | 254,733 | 21.9 | 298,109 | 21,137 | 58.6 |
| Inland Marine | 4,244 | 38,176 | 30,557 | 2.6 | 32,536 | 4,285 | 42.1 |
| Other Liability | 20,001 | 33,354 | 23,552 | 2.0 | 24,761 | 65,563 | 68.3 |
| Fire | 9,305 | 20,214 | 14,278 | 1.2 | 15,397 | 1,979 | 22.2 |
| Allied Lines | 22,120 | 12,839 | 10,838 | 0.9 | 11,536 | 3,490 | 90.6 |
| Ocean Marine | 8,798 | 4,426 | 9,454 | 0.8 | 10,498 | 4,952 | 0.6 |
| Earthquake | 4,790 | 4,873 | 4,958 | 0.4 | 5,229 | 36 | 2.3 |
| Workers' Comp | 223,748 | 444 | 711 | 0.1 | 751 | 4,695 | 401.3 |
| Com'l Multi Peril | 72,100 | | | | | | |
| All Other | 4,576 | 96 | 58 | 0.0 | 59 | 740 | |
| **Totals** | **948,460** | **1,187,081** | **1,164,115** | **100.0** | **1,321,361** | **1,575,535** | **72.1** |

## REINSURANCE

The largest net amount insured in any one risk is $1.5 million. There is no occurrence limit with respect to catastrophes. The Aetna commercial and personal lines pools are protected by a catastrophe reinsurance contract which provides coverage up to $295 million excess of $40 million. The company places facultative reinsurance with direct reinsurers and brokers.

Principal non-affiliated reinsurers currently are Automobile Assigned Risk Massachusetts Facility; Michigan Catastrophic Claims Association; National Flood Insurance Program; North Carolina Reinsurance Facility; and United States Fidelity and Guaranty Company.

The larger amounts recoverable from reinsurers were $1,189.9 million, Aetna Casualty and Surety Company, an affiliate (135% of PHS); $522.5 million, Automobile Insurance Co. of Hartford, an affiliate (59% of PHS) and $101.9 million, Automobile Assigned Risk Massachusetts Facility (12% of PHS). The total amounts recoverable from reinsurers were $5.6 million on paid losses, $917.8 million on unpaid losses, $1,183.0 million on incurred but not reported losses and $44.8 million on unearned premiums.

### UNDERWRITING EXPERIENCE

| | | Loss Ratios | | | Exp Ratios | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | NPE ($000) | Pure Losses | LAE | Loss & LAE | Net Com | Other Exp. | Total Exp | Div Pol | Comb. Ratio |
| 1988 | 404,367 | 64.4 | 15.7 | 80.1 | 14.0 | 14.4 | 28.4 | 1.2 | 109.8 |
| 1989 | 403,951 | 67.8 | 17.4 | 85.2 | 13.9 | 14.6 | 28.5 | 1.3 | 115.1 |
| 1990 | 382,571 | 65.3 | 18.2 | 83.4 | 13.3 | 15.9 | 29.1 | 1.1 | 113.7 |
| 1991 | 1,737,134 | 65.8 | 16.3 | 82.1 | 11.3 | 11.7 | 23.0 | | 105.1 |
| 1992 | 1,321,361 | 72.1 | 14.7 | 86.8 | 17.6 | 18.4 | 36.0 | | 122.8 |

* Combined loss, expense & dividend to policyholders ratio

### COMPARATIVE FINANCIAL AND OPERATING EXHIBIT

All figures except ratios in thousands

| | | | | FINANCIAL ($000) | | | |
|---|---|---|---|---|---|---|---|
| Year | Best's Rating/ Modifier | FPI | Direct Premiums Written | Net Premiums Written | Pre-Tax Operating Income | Total Admitted Assets | Policy-holders' Surplus |
| 1988 | A | p | 1,031,417 | 406,658 | 106,853 | 1,086,471 | 299,675 |
| 1989 | A | p | 1,058,577 | 392,188 | 90,649 | 1,146,808 | 327,653 |
| 1990 | A | p | 1,075,795 | 375,070 | 19,876 | 1,163,601 | 355,194 |
| 1991 | A | p | 1,049,027 | 2,372,476 | -3,195 | 3,426,157 | 852,421 |
| 1992 | A | p | 948,460 | 1,164,115 | 12,516 | 3,142,579 | 883,161 |

| | Profitability Tests | | | Leverage Tests | | | Liquidity Tests | |
|---|---|---|---|---|---|---|---|---|
| Year | Combined Ratio | POI to NPE | Return on PHS | NPW to PHS | Net Leverage | Gross Leverage | Current Liquidity | Quick Liquidity |
| 1988 | 109.8 | 26.4 | 33.6 | 1.4 | 4.1 | 14.7 | 121.2 | 11.7 |
| 1989 | 115.1 | 12.5 | 84.5 | 1.2 | 3.7 | 3.7 | 121.4 | 10.9 |
| 1990 | 113.7 | 5.2 | 2.4 | 1.1 | 3.5 | 3.5 | 121.1 | 12.7 |
| 1991 | 105.1 | -0.2 | 28.5 | 2.7 | 5.7 | 6.1 | 101.4 | 20.7 |
| 1992 | 122.8 | 0.9 | 8.7 | 1.3 | 3.8 | 4.4 | 102.5 | 13.9 |
| 1992 Best's Adjusted Tests | | | 1.6 | 4.2 | 4.4 | 125.7 | 30.6 | |

---

## Affiliated Holdings Group

### AFFILIATED HOLDINGS GROUP

401 Parkway Boulevard, Broomall, PA 19008
Tel: 215-544-0376   Telefax: 215-328-2813   AMB#: 18120

#### Organizational Structure

| AMB | COMPANY NAME | DOMICILE | %OWN |
|---|---|---|---|
| | Affiliated Holdings, Ltd. | PA | |
| 07639 | EBL Life Insurance Company | PA | 100 |
| | Tartan Holdings Ltd. | DB | 100 |
| 09115 | Equitable Beneficial Life Insurance Company | PA | 100 |
| | TRC Corporation | PA | 100 |
| 04740 | American Sentinel Insurance Company | PA | 100 |
| 04481 | The Pennsylvania Reinsurance Company | PA | 100 |

#### *FINANCIAL EXHIBIT ($000)

| Year | Direct Premiums Written | Net Premiums Written | Pre-Tax Operating Income | Total Admitted Assets | Policy-holders' Surplus |
|---|---|---|---|---|---|
| 1988 | 943 | 776 | 288 | 2,654 | 2,082 |
| 1989 | 1,823 | 977 | 298 | 7,047 | 5,430 |
| 1990 | 1,511 | 1,319 | 454 | 7,610 | 5,638 |
| 1991 | 2,652 | 2,858 | 663 | 11,777 | 7,261 |
| 1992 | 1,121 | 2,419 | 679 | 10,353 | 7,003 |
| %Change | | | | | |
| 1989 | 93.3 | 25.9 | | 165.5 | 160.8 |
| 1990 | -17.1 | 34.9 | | 8.0 | 3.8 |
| 1991 | 10.2 | 116.7 | | 54.8 | 28.8 |
| 1992 | -32.7 | -15.4 | | -12.1 | -3.6 |

* Source of Data: A. M. Best Consolidation of Statutory Filings

---

## Affiliated Holdings Group

### AMERICAN SENTINEL INSURANCE COMPANY

1800 Linglestown Road, Suite 406, Harrisburg, PA 17110
Mail: P.O. Box 1651, Harrisburg, PA 17105-1651
Tel: 717-238-4559   Telefax: 717-238-8531   AMB#: 04740   NAIC#: 17965

#### 1993 BEST'S RATING

Based on our current opinion of the company's financial condition and operating performance, it is assigned a Best's Rating of B+ (Very Good). The company's Financial Size Category is Class III. Refer to the Preface for a complete explanation of Best's Rating system and procedure. Rating Effective: June 28, 1993.

# EXHIBIT B

Aetna partners with Italy's Assicurazioni Generali to form an international insurance network that would market insurance products in over 70 countries.

**1967**

Aetna Life and Casualty Inc., a holding company, is formed. Aetna Life Insurance Company announces its intention to restructure its corporate framework into a holding company that would own all the stock of Aetna Life and its affiliated companies, Aetna Casualty and Surety Company and Standard Fire Insurance Company.
Aetna acquires the Participating Annuity Life Insurance Company. Aetna's acquisition of PALIC was in keeping with a strategic plan to grow its financial services.

**1968**

The company is listed on the New York Stock Exchange. Aetna appears on the Big Board for the first time on September 24, 1968, four days after the stockholders approve an increase in stock from 26 million to 40 million shares of common stock, and the creation of 10 million shares of preferred stock.
Aetna expands its international business in 1968 by acquiring a majority interest in Producer's and Citizen's Cooperative Assurance Company, a Sydney, Australia-based entity, for a negotiated price of $10 million.

**1969**

Aetna launches new diversified investment strategy. By diversifying the company's profit base into fields that did not suffer the potentially devastating fluctuations that casualty insurance did, it might be possible to minimize any operating losses the company might incur. As a result, Aetna stated its intention to expand into related insurance fields in both national and international markets.

**1971**

Aetna Life and Casualty Foundation, a vehicle for corporate giving, is formed. The company continued to be an important source of funding for various humanities and social welfare projects, with an emphasis on Aetna's role in the Hartford community. The company backed one Hartford revitalization attempt after another — the Hartford Civic Center, the Aetna World Cup, the Hartford Whalers.

**1972**

Smith retires, and is replaced as CEO by John H. Filer, a Smith protégé and Aetna general counsel.
Aetna sponsors the Aetna World Cup, an international tennis challenge. The Aetna World Cup Tennis Tournament, a world-class sporting event that featured top professionals from Australia and the United States competing in a team format, played for two years in Boston when Aetna agreed to sponsor it in the Hartford area. Tournament proceeds were donated to a different charity each year until 1975, when the Cystic Fibrosis Foundation became the official beneficiary. Aetna continued sponsoring the nationally televised event until 1980.

**1973**

Aetna creates an HMO subsidiary.

# EXHIBIT C



NATIONAL UNION FIRE INSURANCE COMPANY, a Pennsylvania corporation, Plaintiff, v. GREENWICH INSURANCE COMPANY, a Delaware corporation, Defendant.

CASE NO. C07-2065-JCC

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON

*2009 U.S. Dist. LEXIS 12644*

February 2, 2009, Decided

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by, Summary judgment granted by *Nat'l Union Fire Ins. Co. v. Greenwich Ins. Co., 2009 U.S. Dist. LEXIS 53085 (W.D. Wash., June 22, 2009)*

**COUNSEL:** [*1] For National Union Fire Insurance Company, a Pennsylvania corporation, Plaintiff: Stephen G Skinner, LEAD ATTORNEY, JOHNSON ANDREWS & SKINNER, SEATTLE, WA.

For Greenwich Insurance Company, a Delaware corporation, Defendant: Amy M Magnano, Timothy E Allen, William James Leedom, BENNETT BIGELOW & LEEDOM, SEATTLE, WA.

For Harris Transportation Company, LLC, Objector: Dana A Ferestien, LEAD ATTORNEY, Rodney L Umberger, Jr, WILLIAMS KASTNER & GIBBS (SEA), SEATTLE, WA.

**JUDGES:** John C. Coughenour, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** John C. Coughenour

**OPINION**

ORDER

This matter comes before the Court on Plaintiff's Motion for Summary Judgment ("MSJ") (Dkt. No. 29), Defendant's Response (Dkt. No. 34), and Plaintiff's Reply (Dkt. No. 41); Defendant's Motion for Summary Judgment on Contractual Duties ("Contract MSJ") (Dkt.

No. 26), Plaintiff's Response (Dkt. No. 35), and Defendant's Reply (Dkt. No. 40); and Defendant's Motion for Summary Judgment on the Issue of Bad Faith ("Bad Faith MSJ") (Dkt. No. 25), Plaintiff's Response (Dkt. No. 36), and Defendant's Reply (Dkt. No. 39). The Court has carefully considered all these documents, their supporting declarations and exhibits, and the balance of relevant materials in the case [*2] file, and has determined that oral argument is not necessary. The Court finds and rules as follows.

**I. FACTUAL BACKGROUND**

This case involves a dispute between National Union Fire Insurance Company ("National Union") and Greenwich Insurance Company ("Greenwich")[1] regarding the payment of outstanding defense costs incurred in an underlying action that settled in the midst of trial. National Union has sued Greenwich alleging that it failed to pay its portion of the costs incurred in the defense of their co-insured, Harris Transportation Company ("Harris"), in the matter of *Wright v. Chapman* ("the *Wright* litigation").

  1  National Union is also referred to as "AIG" because it is an AIG company, and Greenwich is also known as "XL" because its administrator is XL Environmental. (*See* Compel Mot. 2 (Dkt. No. 18).) For ease of reference, the Court will simply refer to the parties as National Union and Greenwich.

The *Wright* litigation arose from a multi-motor vehicle accident that occurred in December 2003. (MSJ 2 (Dkt. No. 29).) A Harris truck was involved in the colli-

sion, which resulted in serious injuries to the entire Wright family. (*Id.*) In August 2004, the Wrights sued Harris, which was insured [*3] by Greenwich (primary insurer) and National Union (excess insurer). (*See id.*) As the primary insurer, Greenwich retained the law firm of Skellenger Bender ("SB") to defend Harris in the *Wright* litigation, and the case was set for trial in December 2005. (*Id.* at 2-3.) Because the lawsuit had the potential to exceed Greenwich's primary insurance policy limit of $ 1 million, Harris put National Union on notice of the litigation in January 2005. (MSJ 2-3 (Dkt. No. 29).)

In September of 2005, the parties to the *Wright* litigation engaged in mediation. (Bad Faith MSJ 2 (Dkt. No. 25).) Greenwich did not attend the mediation, and instead gave National Union authority to use Greenwich's full policy limits in settlement negotiations. (*Id.*) At the mediation, National Union offered the Wright plaintiffs $ 1.25 million ($ 1 million represented Greenwich's limits, and $ 250,000 represented National Union's excess coverage layer). The plaintiffs rejected the offer, and ended the mediation by demanding a much higher amount for settlement. (*Id.*)

After the mediation, National Union requested that SB be replaced as defense counsel. (*Id.*) Greenwich contends that National Union wrested control of the case [*4] by demanding replacement of SB in order to select defense counsel of its choosing. (*Id.* at 3.) National Union asserts that a change in counsel was favored by Harris and precipitated by concerns over whether SB was adequately prepared to proceed to trial. (MSJ 3 (Dkt. No. 29).) Harris' Chief Financial Officer, Jan Frost, states that Harris determined that a change in counsel was necessary to protect its interests and obtain effective representation at trial. (Frost Decl. PP 13-14 (Dkt. No. 20 at 3).) Regardless, Greenwich does not dispute that it agreed to the substitution of Williams Kastner & Gibbs ("WKG") as defense counsel, subject to certain conditions. (Bad Faith MSJ 3 (Dkt. No. 25).) An email exchange indicates that Greenwich was agreeable to paying WKG the same hourly rate paid to SB if National Union would pay the additional costs associated with WKG's increased billing rates and any costs required to bring WKG "up to speed." (*See* New Counsel emails (Dkt. No. 23 at 9-10).) WKG then took over the defense in the *Wright* litigation and filed a notice of substitution in September 2005. (MSJ 5 (Dkt. No. 29).) Given the short time until the December 2005 trial date, WKG sought and [*5] obtained a three month trial continuance. (*Id.*)

Shortly after WKG assumed control of the defense, a billing dispute arose between Greenwich and National Union regarding the payment of WKG's fees. In October 2005, WKG issued an invoice for the time spent in September transitioning the file from SB. (*See* Sept. Invoice (Dkt. No. 30-3 at 53-66).) National Union paid the entire

$ 43,929.42 of this initial invoice as "getting up to speed" costs. (*Id.*) In late November 2005, WKG issued an invoice for fees and costs incurred through October, totaling $ 195,026.99. (Bad Faith MSJ 3 (Dkt. No. 25).) National Union paid the portion of the bill representing the increased rates charged by WKG, as well as the fees for some of WKG's assistants and the jury consultant. (*See* Dec. 7 email (Dkt. No. 30-2 at 30-31).) After October bill, National Union accounted for $ 30,679.49 of the October bill, the remaining net invoice for $ 164,347.50 was forwarded to Greenwich for payment. (*See id.*) Greenwich was surprised by the amount of the bill, and declined to pay any of it without having the bill reviewed. (*See* Dec. 8 email (Dkt. No. 30-2 at 36).) After protests by WKG and National Union, Greenwich agreed to pay 50% of the [*6] outstanding October bill, which amounted to $ 82,500, but refused to pay anything more without an audit. (*See* Dec. 22 email (Dkt. No. 30-2 at 49).)

In December 2005, Greenwich hired William Leedom as monitoring counsel to assist in resolving the billing dispute. (*Id.*) Mr. Leedom began seeking documents from WKG, including letters of engagement and billing guidelines. (Leedom Dec. 22 email (Dkt. No. 30-2 at 51-52).) WKG expressed concern that the documents requested may be privileged and declined to respond to Mr Leedom's requests. (*See id.*) Greenwich contends that WKG's failure to provide the documents prevented it from undertaking an audit. (Bad Faith MSJ 5 (Dkt. No. 25).)

In January 2006, National Union sent a letter to Greenwich that outlined its position on the billing dispute. (Jan. 6 Letter (Dkt. No. 30-2 at 58-60).) National Union reiterated its request that Greenwich comply with their allocation agreement on defense costs and pay the remainder of the October bill. (*Id.*) National Union also asserted that Greenwich, as the primary insurer, had a contractual obligation to defend the insured and pay Harris' defense costs. (*Id.*) In its response, Greenwich recognized its duty to defend [*7] as the primary insurer, but contended that WKG had failed to provide the necessary documents to allow it to perform an audit of the outstanding bill. (Jan. 10 Letter (Dkt. No. 30-2 at 62-64).) Thereafter, Greenwich notified National Union that it would make no further payments to WKG for the defense of Harris in the *Wright* litigation. (Jan. 17 Letter (Dkt. No. 30-3 at 6-7).) Greenwich contended that because National Union "assumed control over Harris' defense," it had assumed the sole responsibility for the cost of defending Harris. (*Id.*)

Despite the protracted billing dispute, WKG continued to defend Harris and the case proceeded to trial. On March 1, 2006, during the second week of trial, the case settled for $ 3 million. (MSJ 8 (Dkt. No. 29).) [2] At the close of the defense, WKG was owed $ 498,777.80, in-

cluding $ 449,573.08 of which National Union contends is owed by Greenwich pursuant to the parties' allocation agreement. (*Id.*) In December 2006, National Union agreed to pay WKG all outstanding defense invoices in exchange for an assignment of all claims from both Harris and WKG. (Assignment (Dkt. No. 30-3 at 9-11).) National Union then filed this lawsuit against Greenwich alleging,    [*8] *inter alia,* breach of contract and bad faith.

> 2    Greenwich exhausted its $ 1 million primary policy limits in payment toward the $ 3 million settlement and National Union paid the remainder as the excess insurer. (Compel Mot. 5 (Dkt. No. 18).)

## II. ANALYSIS

The parties have filed cross-motions for summary judgment. National Union requests summary judgment awarding it the defense costs incurred in the *Wright* litigation, prejudgment interest and litigation expenses under the *Olympic Steamship* rule. (MSJ 24 (Dkt. No. 29).) Greenwich requests a summary judgment determination on National Union's contractual duties (Contract MSJ 1 (Dkt. No. 26)), and seeks summary judgment dismissal of National Union's bad faith claims (Bad Faith MSJ 3 (Dkt. No. 25).) The Court will address each motion in turn below.

### A. Request to Strike

As an initial matter, National Union requests that the expert report of Robert Belt, submitted by Greenwich, be stricken from the record and not considered by the Court in ruling on the motions for summary judgment. (MSJ Reply 2 (Dkt. No. 41).) The Federal Rules of Civil Procedure provide that "a party must disclose to the other parties the identity of any witness it may use at    [*9] trial to present [expert testimony]." *FED. R. CIV. P. 26(a)(2)(A).* Absent a stipulation otherwise, disclosure of expert testimony must be made "at least 90 days before the date set for trial." *FED. R. CIV. P. 26(a)(2)(C).* "If a party fails to provide information or identify a witness as required by *Rule 26(a)* or *(e)*, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless." *FED. R. CIV. P. 37(c)(1).*

There is no dispute that Greenwich disclosed Robert Belt as an expert witness after the October 26, 2008, expert disclosure cutoff date. Greenwich disclosed Belt for the first time on November 4, 2008, after both parties had filed cross motions for summary judgment. (Expert Disclosure (Dkt. No. 31).) In opposition to National Union's motion for summary judgment, Greenwich relied

upon Belt's expert report in support of numerous so-called "reasonable inferences," each of which it contends precludes summary judgment. (*See* MSJ Resp. 4-5 (Dkt. No. 34).) To permit consideration of Greenwich's belated expert report would unfairly prejudice National Union's motion for summary    [*10] judgment, which justifiably relied on the absence of any such report. Because National Union's motion for summary judgment was filed after the expert disclosure cutoff date, and was based in part on the absence of any expert report, the Court finds that Greenwich's untimely disclosure cannot be substantially justified or harmless with respect to the motions for summary judgment. *See Nw. Pipeline Corp. v. Ross, No. C05-1605RSL, 2008 U.S. Dist. LEXIS 32984, 2008 WL 1744617, at *8-10 (W.D. Wash. 2008)* ("*Rule 37(c)(1)*'s exclusionary sanction has been characterized by the Ninth Circuit and the advisory committee as 'automatic' and 'self-executing.'"). Accordingly, the expert report of Robert Belt is hereby STRICKEN from the record and will not be considered by the Court in ruling on the cross motions for summary judgment below.

### B. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(c).* In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable    [*11] to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996).* A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson, 477 U.S. at 248.* The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id. at 251-52.* The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson, 477 U.S. at 250.* If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex, 477 U.S. at 323-24.*

### C. Plaintiff's Motion for Summary Judgment

National Union seeks a summary judgment determination that Greenwich breached its liability [*12] insurance contract with its insured when it stopped paying for Harris' defense. (MSJ 1 (Dkt. No. 29).) National Union argues that Greenwich breached its duty to defend Harris in the *Wright* litigation and that National Union is entitled, as an assignee of Harris [3] and under the doctrine of equitable subrogation, to reimbursement for the costs incurred in defending Harris. (*Id.* at 9-18.) National Union contends that Greenwich owes $ 449,573.08 according to the allocation agreement between the insurers. (*Id.* at 18-21.)

> 3   "An assignee steps into the shoes of the assignor, and has all the rights of the assignor." *Estate of Jordan v. Hartford Accident & Indem. Co., 120 Wn.2d 490, 844 P.2d 403, 407 (Wash. 1993).* Harris assigned to National Union all of its claims against Greenwich relating to or arising out of the *Wright* litigation. (Assignment (Dkt. No. 30-3 at 9-11).) Thus, National Union can assert Harris' rights in this lawsuit for breach of contract, bad faith, and violation of the Washington Consumer Protection Act.

**1. Breach of Contract**

The interpretation of an insurance policy is a question of law. *Overton v. Consol. Ins. Co., 145 Wn.2d 417, 38 P.3d 322, 325 (Wash. 2002).* Insurance policies are contracts, which are [*13] construed as a whole with the terms interpreted in the way that would be understood by an average person purchasing insurance. *Id.* If the language is clear and unambiguous, the court must enforce it as written and may not create ambiguity where none exists. *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co., Inc., 134 Wn.2d 413, 951 P.2d 250, 256 (Wash. 1998).* The insurer's duty to defend exists where the complaint against the insured, construed liberally, alleges facts which could impose liability upon the insured within the policy's coverage. *Truck Ins. Exch. v. VanPort Homes, 147 Wn.2d 751, 58 P.3d 276, 281-82 (Wash. 2002).* The duty to defend is a valuable service paid for by the insured and one of the principal benefits of the insurance contract. *Safeco Ins. Co. of Amer. v. Butler, 118 Wn.2d 383, 823 P.2d 499, 504 (Wash. 1992).* The insurer is relieved of its duty to defend only if the alleged claim is "clearly not covered by the policy." *VanPort Homes, 58 P.3d at 282.*

The undisputed evidence establishes that Greenwich breached its contractual duty to defend Harris when it stopping paying the costs of Harris' defense. *See RESTATEMENT (SECOND) OF CONTRACTS § 235 (1981)* (breach of contract is the nonperformance of a contractu-

al [*14] duty when performance is due). Greenwich's insurance policy with Harris expressly provides:

> We have the right and the duty to defend any "insured" against a "suit" asking for damages or a "covered pollution expense." . . . We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payments of judgments or settlements.

(Def. Ins. Policy 0687 (Dkt. No. 30-3 at 17).) According to the plain language of the policy, Greenwich's duty to defend Harris continued until its primary coverage limits were paid and exhausted. (*See id.*) This duty to defend necessarily included the duty to *pay for* the defense costs. *See Waite v. Aetna Cas. & Sur. Co., 77 Wn.2d 850, 467 P.2d 847, 851-52 (Wash. 1970)* (insurer who breaches its duty to defend is required to pay reimbursement for defense costs incurred); *W. Pac. Ins. Co. v. Farmers Ins. Exch., 69 Wn.2d 11, 416 P.2d 468, 472 (Wash. 1966)* (primary insurer with duty to defend is "liable for the costs of the defense"). Greenwich did not exhaust its policy limits until paying its share of the *Wright* settlement in May 2006. Nevertheless, Greenwich undisputedly stopped [*15] paying for Harris' defense soon after WKG took over as counsel and a billing dispute erupted. It is undisputed that Greenwich's policy limits were not "exhausted by payments of judgment or settlements" in January 2006 when it officially notified National Union that it would make no further payments to WKG for Harris' defense. (*See* Jan. 17 Letter (Dkt. No. 30-3 at 6).) Therefore, Greenwich's early termination of financial support for its insured's defense violated its unequivocal duties under the insurance contract with Harris.

In its Response, Greenwich advances one primary argument as to why it did not breach its contractual duty to defend Harris. [4] Greenwich argues that "because Harris suffered no damages by any act or omission alleged on the part of Greenwich/XL, Harris has no breach of contract claim against Greenwich/XL that is assignable to [National Union]." (MSJ Resp. 6 (Dkt. No. 34).) Greenwich essentially argues that it cannot be found to have breached its duty to defend because Harris received an adequate defense and was never billed for the defense costs. The Court disagrees.

> 4   Greenwich also references arguments from its motions for summary judgment on bad faith and contractual [*16] duties. The Court will ad-

dress these arguments in their respective sections below.

First, the record establishes that the billing dispute, precipitated by Greenwich's unwillingness to pay, caused harm to Harris. Harris paid insurance premiums to Greenwich in exchange for primary coverage that included a duty to defend. When Greenwich prematurely stopping paying for Harris' defense, Harris did not receive the benefit of the bargained-for exchange, which constitutes damage. *See McRory v. N. Ins. Co. of N.Y., 138 Wn.2d 550, 980 P.2d 736, 739 (Wash. 1999)* (even though excess insurer paid the defense costs, insured suffered damage by losing the benefit of its bargain with primary insurer who failed to defend it). In December 2005, Harris' broker wrote an email to National Union discussing Harris' view on the defense provided by Rod Umberger of WKG and the impact of the billing dispute:

> The folks at Harris are also very pleased with the work Rob Umberger has done on their behalf. In fact keeping this firm [WKG] retained has now become a time-consuming activity that *occupies Harris' time and resources daily.* My ins'd is in the business of transportation, yet too much of their time has recently been dedicated [*17] to wrangling adjusters and ensuring payments are made and ultimately a strong defense is not prejudiced. As you know, Rod Umberger has threatened to walk if his outstanding bills are not paid in full by December 30, 2005.

(Dec. 20, 2005 email (Dkt. No. 25-3 at 15-16) (emphasis added).) Thus, Greenwich's refusal to pay also created uncertainty as to whether WKG would continue to represent Harris and compromised Harris' best interests by occupying its time and resources daily, thereby causing it extra expense.

Second, Greenwich's "no harm, no foul" argument is unsupportable as a matter of public policy and has already been rejected by the Washington Supreme Court. *See McRory, 980 P.2d at 741* (rejecting insurer's "no damages" argument and explaining that "an insurer who improperly refuses coverage should not profit by the insured's foresight to have other insurance protection"). Greenwich cannot fulfill *its duty* to defend merely by claiming that the insured received an adequate defense paid for by another insurer. Accepting Greenwich's argument would create an untenable incentive for insurance companies to shirk their responsibility to pay defense costs in hopes that another insurer will [*18] pick

up the bill and absolve it of liability for its failure to defend.

Greenwich's primary policy expressly provides that it had a contractual duty to defend Harris until its limits were paid and exhausted. Greenwich undisputedly terminated payments for Harris' defense prior to the exhaustion of its policy limits. Accordingly, the Court finds that Greenwich breached its contractual duty to defend Harris when it stopped paying for the defense costs.

## 2. Subrogation

Subrogation exists when a party, not a volunteer, pays another's obligation for which the subrogee has no primary liability in order to protect such subrogee's own rights and interests. *Millers Cas. Ins. Co. of Texas v. Briggs, 100 Wn.2d 9, 665 P.2d 887, 890 (Wash. 1983).* There are two different types of subrogation: conventional subrogation, which arises by contract, and equitable subrogation, which arises by operation of law. [5] *Mut. of Enumclaw Ins. Co. v. USF Ins. Co., 164 Wn.2d 411, 191 P.3d 866, 874 (Wash. 2008).* "[A]n insurer who receives full contractual assignment of an insured's rights may bring a conventional subrogation claim to enforce those rights." *Id. at 875.* Because National Union received a full assignment of rights, it may bring a conventional [*19] subrogation claim and assert Harris' claims against Greenwich.

> 5   Both types of subrogation involve the right to reimbursement. *Mahler v. Szucs, 135 Wn.2d 398, 957 P.2d 632, 640 (Wash. 1998).* The difference involves the mechanism for enforcement of this right, which may arise either by contract (conventional subrogation) or by operation of law (equitable subrogation). *Id.*

National Union may also pursue remedies under the doctrine of equitable subrogation to recover the costs of defense paid on Harris' behalf. "Equitable subrogation is a legal fiction whereby a person who pays a debt for which another is primarily responsible is subrogated to the rights and remedies of the other." *Truck Ins. Exch. of the Farmers Ins. Group v. Century Indem. Co., 76 Wn. App. 527, 887 P.2d 455, 458 (Wash. Ct. App. 1995).* In Washington, "[a]n excess insurer has no duty to defend until the primary insurer has exhausted its obligations and is entitled to reimbursement for costs incurred in assuming the defense." *Id.* To hold otherwise would permit the primary carrier to "profit from its wrongful failure to defend." *Id.*

Greenwich first argues that National Union is not entitled to any equitable remedies because it lacked good faith and has "unclean [*20] hands." (MSJ Resp. 8-11 (Dkt. No. 34).) Greenwich contends that National Union

"formulated a plan to protect its interest, falsely claimed Harris was dissatisfied with SB, had WK appointed counsel, and controlled the litigation from that point forward." (*Id.* at 15.) The record, however, does not substantiate Greenwich's allegations of "unclean hands." First, there is no evidence that National Union lied when it asserted that the change in counsel was due to client dissatisfaction. Harris' CEO, Jan Frost, states in his declaration that Harris did not have "any confidence that [the lawyer from SB] would be able to effectively represent us at trial," and therefore "[w]e decided that, in order to protect our interests, it was necessary to change attorneys as soon as possible." [6] (Frost Decl. PP 13-14 (Dkt. No. 20 at 3).) Second, regardless of who requested the change in counsel, it is undisputed that Greenwich "agreed to transfer the file to the [WKG] firm." (Bad Faith MSJ 3 (Dkt. No. 25).) Third, the fact that National Union may have "controlled the litigation" after the change in counsel is not evidence of "unclean hands," but rather is likely indicative of the differing interests of [*21] the two insurers. [7] Moreover, Greenwich's allegations that National Union wrested control of the case from it are disingenuous considering that it chose *not* to even attend the mediation and instead gave National Union authority to negotiate with its full policy limits. (*Id.* at 2.) In short, the Court finds no merit to Greenwich's allegations that National Union has "unclean hands."

> [6] The fact that Mr. Frost, in previous deposition testimony, could not "specifically identify" the concerns that precipitated the change in counsel does not demonstrate that National Union falsely claimed that Harris was dissatisfied. (*See* Frost Dep. 25:1-26:4 (Dkt. No. 34-2 at 6-7).)
>
> [7] As the primary insurer with a duty to defend and policy limit of $ 1 million, Greenwich had an incentive to settle the case early and minimize its defense costs. (*See* Frost Decl. P 9 (Dkt. No. 20 at 2) ("From Harris' perspective it appeared that Greenwich had decided early on that it was going to have to pay out its $ 1,000,000 policy limits and, therefore, it should try to minimize defense costs and get the case settled even it meant Harris agreeing to a settlement amount far in excess of the $ 1,000,000 policy limits.").) Conversely, [*22] as the excess insurer, National Union had an incentive to vigorously defend the case and prevent exposure to a large verdict or settlement.

Greenwich also argues that National Union is not entitled to equitable subrogation because it was acting as a "volunteer" when it paid WKG the outstanding costs of defense. (MSJ Resp. 8-11 (Dkt. No. 34).) "One is a volunteer and not entitled to subrogation if, in making payment, he has no right or interest of his own to protect and acts without obligation, moral or legal, and without being

requested to do so by a person liable on the obligation." *Hartford Ins. Co. v. Ohio Cas. Ins. Co.*, 145 Wn. App. 765, 189 P.3d 195, 200 (Wash. Ct. App. 2008). In *Hartford*, the court held that an insurer who paid a settlement on behalf of its insured, a defunct limited liability company, did not act as a volunteer and was entitled to reimbursement from another insurer through a subrogation action. *Id.* at 201. Even though the defunct insured may not have been able to assert indemnity or bad faith claims, the paying insurer was not a "volunteer" because nonpayment would have been inconsistent with the insurer's obligation to act in good faith and "overly confident that [it] no longer [*23] faced any threat of civil litigation." *Id.* As in *Hartford*, National Union was not acting as a "volunteer" when it paid Harris' outstanding defense costs because it had an obligation to act in good faith and in its insured's best interests. Moreover, as insurer participating in Harris' defense, National Union was acting to protect its own interests against a potential lawsuit to recover the costs of the defense. National Union was not acting as a "volunteer" in paying Harris' defense costs and therefore is entitled to pursue its equitable remedies through subrogation.

Under the principles of equitable subrogation, National Union is entitled to reimbursement from Greenwich for a portion of the outstanding defense costs that it paid. *See Truck Ins. Exch.*, 887 P.2d at 458 ("An excess insurer . . . is entitled to reimbursement for costs incurred in assuming the defense."); *see also Allstate Ins. Co. v. Gip*, 797 F. Supp. 763, 765 (N.D. Cal. 1992) ("An excess insurer possesses a right of reimbursement under equitable principles of subrogation, when it pays an obligation that a primary insurer was obligated to pay."). As the primary insurer, Greenwich had the duty to defend Harris and the primary [*24] obligation to pay for Harris' defense costs. *See Truck Ins. Exch.*, 887 P.2d at 458. Because National Union paid Harris' outstanding defense costs, for which Greenwich was primarily responsible, it is entitled to reimbursement to achieve proper allocation of those costs. The remaining issue to be determined is the amount of the defense costs that is properly allocated to Greenwich.

### 3. Allocation Agreement

National Union argues that it has an enforceable allocation agreement with Greenwich under which Greenwich owes $ 449,573.08 for the outstanding defense costs that it paid. (MSJ 18-21 (Dkt. No. 29).) Washington follows the objective manifestation test for contract formation. *Keystone Land & Dev. v. Xerox Corp.*, 152 Wn.2d 171, 94 P.3d 945, 949 (Wash. 2004). Contract formation under this test requires manifestation of mutual assent (offer and acceptance) and consideration. *See id.* Mutual assent is determined by "looking to the objec-

tive acts or manifestations of the parties rather than the unexpressed subjective intent of any party." *Wilson Court Ltd. P'ship v. Tony Marioni's, Inc., 134 Wn.2d 692, 952 P.2d 590, 594 (Wash. 1998).* A promise given in exchange for a promise is sufficient consideration to support a contract. [*25] *See, e.g., King v. Riveland, 125 Wn.2d 500, 886 P.2d 160, 164 (Wash. 1994).*

The objective acts and manifestations of Greenwich and National Union demonstrate that the parties formed an enforceable contract regarding the allocation of the costs for Harris' defense. Following the unsuccessful mediation, National Union requested a change in counsel. Greenwich was resistant to changing, but admits that it "agreed to a change in defense counsel on certain conditions." (Compel Mot. 2 (Dkt. No. 18 at 2).) Greenwich's Claims Manager, Patty Tyler, proposed those conditions in writing in a September 21, 2005 email:

> I received your voice mail -- to clarify *my offer, I am agreeable* to continue to pay he [sic] same rates being paid to our current counsel Skellenger Bender of $ 235/Partner    $    220/associate    $ 110/paralegal -- I will not pay for costs associated with the transfer or for fees for new counsel to review the file and get up to speed.

(New Counsel emails (Dkt. No. 23 at 9-10) (emphasis added).) In this email, Greenwich offered to pay the same hourly rates paid to SB if National Union would pay any additional costs associated with the new counsel. The next day, National Union accepted these conditions in [*26] writing, agreeing to pay the additional costs of WKG's increased billing rates and all costs required to bring WKG "up to speed." (*See id.*) Thus, the parties formed a contract by exchanging promises to each pay a specific portion of Harris' defense costs.

The subsequent conduct and communications of the parties confirms that they formed an allocation agreement on defense costs. *See RESTATEMENT (SECOND) OF CONTRACTS § 19, cmt. a* ("Conduct may often convey as clearly as words a promise or an assent to a proposed promise.") In October 2005, WKG issued its first invoice for $ 43,929.42, which represented the time spent transitioning the file from SB to WKG. (Sept. Invoice (Dkt. No. 30-3 at 53-66).) In accordance with the allocation agreement, National Union paid this entire amount as "getting up to speed" costs. (*See id.*) WKG's second bill totaled $ 195,026.99 and represented defense costs for the month of October. (*See Bad Faith MSJ 3* (Dkt. No. 25).) Again, in accordance with the allocation agreement, National Union paid $ 30,679.49 of the bill,

which represented WKG's increased rates as well as other up to speed costs. (*See* Dec. 7 email (Dkt. No. 30-2 at 30-31).) The remaining net invoice [*27] for $ 164,347.50 was forwarded to Greenwich for payment. (*See id.*) Greenwich stated that the bill "may have to be audited considering it's [sic] size," but did not dispute that it had an obligation to pay its portion pursuant to the allocation agreement. (Dec. 8 email (Dkt. No. 30-2 at 36).) As the billing dispute evolved, Greenwich stated its concern that "there is still a great deal of time and expense that has been submitted with this bill that is still 'getting up to speed.'" (Dec. 14 email (Dkt. No. 30-2 at 44).) Thus, Greenwich was operating under the terms of the allocation agreement by recognizing its obligation to pay a portion of the bill while referring to National Union's obligation to pay "getting up to speed" costs.

After protests by WKG and National Union, Greenwich ultimately agreed to pay 50% of the outstanding October bill, which amounted to $ 82,500, but refused to pay anything more without an audit. (*See* Dec. 22 email (Dkt. No. 30-2 at 49).) This payment confirms that Greenwich understood its obligation to pay Harris' defense costs pursuant to the allocation agreement, but was disputing the amount of WKG's bill and whether the bill comported with its billing guidelines. [*28] Notably, Greenwich never once disputed the existence of an allocation agreement during the pendency of the *Wright* litigation. The parties' words and conduct therefore demonstrate the formation of an enforceable contract allocating the costs of Harris' defense.

Greenwich asserts that there is an issue of material fact as to the existence of an allocation agreement because National Union's claims representative, Karen Massie, stated on two occasions that she believed there was no contract between the parties. Under Washington law, however, the objective acts and manifestations of the parties, not their subjective intent, determines the existence of a contract. *See Wilson Court, 952 P.2d at 594.* Because the parties' objective conduct and words demonstrate mutual assent, Ms. Massie's personal belief as to whether a contract was formed is of no consequence.

Greenwich next argues that no allocation agreement exists because "there was no meeting of the minds on the essential terms of the contract." [8] (MSJ Resp. 13 (Dkt. No. 34).) Greenwich contends that the parties never agreed on who was to control the litigation and make strategic decisions, or what billing guidelines would be followed. (*Id.* at 15.) [*29] But these terms were not essential to the subject matter of the contract--the allocation of defense costs. The parties agreed to the essential allocation terms when Greenwich agreed to pay the rates paid to prior counsel, "$ 235/Partner $ 220/associate $ 110/paralegal," in return for National Union's promise to

pay the additional costs of the new counsel. (New Counsel emails (Dkt. No. 23 at 9-10).) Given the scope of the contract, terms dictating the exact control of the litigation and billing guidelines were not essential to the parties' allocation agreement. *See McEachren v. Sherwood & Roberts, 36 Wn. App. 576, 675 P.2d 1266, 1268 (Wash. Ct. App. 1984)* (the scope of the contract determines what terms are essential). Accordingly, the allocation agreement is an enforceable contract that apportions the legal liability of the parties for the costs of Harris' defense.

> 8  Greenwich also argues that there is no contract because National Union has "unclean hands." (MSJ Resp. 13-15 (Dkt. No. 34).) As explained above, Court finds insufficient evidence of "unclean hands" and rejects this argument.

Even if the allocation agreement were unenforceable, the principles of equitable subrogation dictate allocating [*30] the defense costs according to the terms proposed by Greenwich and accepted by National Union. Subrogation is favored in Washington law and "is always liberally allowed in the interests of justice and equity." *Mahler, 957 P.2d at 640* (quoting J.D. O'Malley & Co. v. Lewis, 176 Wash. 194, 28 P.2d 283, 286 (1934)). The essential purpose of subrogation is "to provide for proper allocation of payment responsibility" and "to impose ultimate responsibility for a wrong or loss on the party who, in equity and good conscience, ought to bear it." *Id.* The terms of the allocation agreement here are reasonable and equitable. As the primary insurer, Greenwich undisputedly owed a contractual duty to defend Harris and pay its defense costs until its policy limits were exhausted. National Union did not owe a duty to defend, but rather the right to participate in the defense. Thus, Greenwich had the sole responsibility to fund Harris' entire defense. Greenwich's offer to agree on a change in counsel, but only pay the same rates being paid to the current counsel, is reasonable because it had a duty to continue funding Harris' defense. By the same token, National Union's agreement to pay the additional costs associated [*31] with new counsel is reasonable because its participation and request for new counsel increased the costs of the defense, for which Greenwich was primarily liable. The terms of the allocation agreement therefore represent a "proper allocation of payment responsibility" by allocating the defense costs between the parties in a just and equitable manner that takes into account their respective obligations to their co-insured.

## 4. Amount of Reimbursement

At the close of the defense, National Union contends that WKG's outstanding invoices totaled $ 498,777.80,

including $ 449,573.08 of which was owed by Greenwich under the parties' allocation agreement. (MSJ 8, 21 (Dkt. No. 29).) However, National Union has not provided the Court with documentation of WKG's total outstanding invoices of $ 498,777.80 or how it calculated the $ 449,573.08 it claims is owed under the allocation agreement. [9] The assignment of rights states that National Union paid WKG "the sum of $ 449,573.08 in *full payment* of WKG's outstanding invoices for the Wright lawsuit." (Assignment (Dkt. No. 30-3 at 9-11) (emphasis added).) It is not clear from the record whether this payment represented the total amount of the outstanding [*32] invoices, or only the remaining amount owed by Greenwich under the allocation agreement. If the latter is true, then National Union should have documentation of separate payment and calculations for its portion of the invoices, which presumably would equal the difference between the total amount owed and the amount owed by Greenwich.

> 9  The only WKG invoice provided to the Court is the September invoice, which was paid in its entirety by National Union as "getting up to speed" costs. (*See* Sept. Invoice (Dkt. No. 30-3 at 53-66).)

Nevertheless, because the allocation agreement is an enforceable contract, National Union is entitled to reimbursement for the amount paid in Harris' defense that is properly allocated to Greenwich under the agreement. Specifically, Greenwich owes National Union that portion of WKG's outstanding invoices that reflects hourly billing rates of $ 235/Partner, $ 220/Associate, and $ 110/Paralegal. Moreover, because National Union paid Harris' outstanding defense costs, for which Greenwich was primarily responsible, it has a right to equitable subrogation to achieve proper allocation of those costs. *See Truck Ins. Exch., 887 P.2d at 458.* The Court finds that the allocation [*33] agreement provides a "proper allocation of payment responsibility" under the principles of equitable subrogation. *See Mahler, 957 P.2d at 640.* Accordingly, under the allocation agreement and principles of equitable subrogation, the Court finds, as a matter of law, that National Union is entitled to reimbursement from Greenwich for that portion of WKG's outstanding invoices reflecting hourly billing rates of $ 235/Partner, $ 220/Associate, and $ 110/Paralegal. [10]

> 10  The Court cannot fix the specific amount of reimbursement at this time because National Union has not provided evidence or calculations to support the amount it claims is owed under the allocation agreement. This insufficiency does not, however, prevent the Court from finding that National Union is entitled to reimbursement under

the terms of the allocation agreement as a matter of law.

## 5. Prejudgment Interest

National Union requests prejudgment interest on the costs incurred in defending Harris. (MSJ 22 (Dkt. No. 29).) An award of prejudgment interest is based on the principle that a defendant "who retains money which he ought to pay to another should be charged interest on it." *Prier v. Refrigeration Eng'g Co., 74 Wn.2d 25, 442 P.2d 621, 626 (Wash. 1968)*. [*34] Prejudgment interest is based on the principle of "preventing the unjust enrichment of the defendant who has wrongfully delayed payment." *Polygon Nw. Co. v. Am. Nat. Fire Ins. Co., 143 Wn. App. 753, 189 P.3d 777, 794 (Wash. Ct. App. 2008)*. Prejudgment interest is available when an amount claimed is "liquidated," which occurs where "the evidence furnishes data which, if believed, make it possible to compute the amount with exactness, without reliance on opinion or discretion." *Hansen v. Rothaus, 107 Wn.2d 468, 730 P.2d 662, 664 (Wash. 1986) (quoting Prier, 442 P.2d at 626)*. The fact that a claim is disputed does not make it "unliquidated" so long as it may be determined by reference to an objective source. *Egerer v. CSR W., LLC, 116 Wn. App. 645, 67 P.3d 1128, 1133 (Wash. Ct. App. 2003)*. The touchstone for an award of prejudgment interest is that a party has the "use value" of the money improperly withheld. *Mahler, 957 P.2d at 649*.

Here, the allocation agreement between the parties provides an objective source by which National Union's reimbursement can be ascertained without the exercise of discretion. Greenwich's responsibility for defense costs under the agreement can be determined with precision by multiplying the agreed upon hourly [*35] rates of $ 235/Partner, $ 220/Associate, and $ 110/Paralegal against the respective hours billed in WKG's outstanding invoices. National Union's claim for reimbursement for defense costs is therefore "liquidated," and an award of prejudgment interest is warranted. Moreover, because Greenwich stopped paying defense costs, it retained the "use value" of money that should have been used to fulfill its duty to defend. Prejudgment interest is particularly appropriate here to prevent Greenwich from being unjustly enriched for its wrongful refusal to pay its insured's defense costs. *See Polygon Nw., 189 P.3d at 794* ("[A]n award of prejudgment interest is in the nature of preventing unjust enrichment of the defendant who has wrongfully delayed payment."). Accordingly, the Court finds that Greenwich owes prejudgment interest on its allocated portion of the defense costs accrued since December 28, 2006, the date that National Union paid WKG's invoices in full on Harris' behalf. (*See* Assignment (Dkt. No. 30-3 at 9-11).)

## 6. Attorney Fees

Under Washington law, an insured who successfully sues an insurer to obtain insurance coverage is entitled to an award of attorney fees. *Olympic S.S. Co., Inc. v. Centennial Ins. Co., 117 Wn.2d 37, 811 P.2d 673, 681 (Wash. 1991)*. [*36] In *Olympic Steamship*, the Washington Supreme Court held that "an award of fees is required in any legal action where an insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract . . . ." *Id*. This entitlement to attorney fees arises, in part, from "the insurer's enhanced fiduciary duty not to put its financial interests above those of the insured." *McRory, 980 P.2d at 738*. The *Olympic Steamship* rule has since been extended to permit an insured's assignee to recover attorney fees when it is compelled to sue an insurer to secure coverage. *Estate of Jordan v. Hartford Accident & Indem. Co., 120 Wn.2d 490, 844 P.2d 403, 413-14 (Wash. 1993)*. An award of attorney fees is limited, however, to circumstances where "the insured litigates an issue of coverage, but not if the issue is merely about the value of a claim." *Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 930 P.2d 288, 295 (Wash. 1997)*. "Coverage disputes include both cases in which the issue of any coverage is disputed and cases in which the 'extent of the benefit provided by an insurance contract' is at issue." *Id*. (citation omitted).

The arguments presented in Greenwich's pleadings demonstrate [*37] that, at bottom, coverage for Harris' outstanding defense costs is in dispute. Rather tellingly, Greenwich describes its motion for summary judgment on contractual duties as requesting "a ruling on summary judgment that it owes no *contractual duty to pay the outstanding defense costs* . . . due to Section II.C of the [National Union] Policy, as well as the 'other insurance' clause of the Greenwich Policy." (MSJ Resp. 5-6 (Dkt. No. 34) (emphasis added).) In other words, Greenwich contends that the outstanding defense costs are *not covered* by its policy by operation of (1) its "other insurance" clause and (2) a provision in National Union's policy. Greenwich does not admit that National Union is entitled to reimbursement and dispute only the amount of reimbursement. Instead, Greenwich advances multiple theories as to why the outstanding costs of defense are beyond the scope of its insurance policy. *See Leingang, 930 P.2d at 295* (attorney fees warranted where "insurer admitted there was some coverage but disputed the scope of coverage"). For example, Greenwich expressly "denies that its policy provides *coverage of any sort* for attorney fees and costs incurred because of [National Union's] [*38] choice to 'participate' in Harris' defense." (Contract MSJ Reply 8 (Dkt. No. 40) (emphasis added).) Greenwich also asserts that its coverage for defense costs is excess over the National Union policy by operation of

Greenwich's "other insurance" clause. [11] (*Id.* at 7.) Greenwich is contesting and litigating whether it has a contractual duty to pay defense costs. In light of these arguments, Greenwich's assertion that coverage is not in dispute is without merit. Here, Harris' assignee was compelled to bring suit to obtain reimbursement for defense costs incurred as a result of Greenwich's failure to honor its duty to defend. This lawsuit involves a coverage dispute, and therefore, National Union is entitled to reasonable attorney fees. [12]

> 11    Greenwich has apparently abandoned this argument. (Contract MSJ Reply 7 (Dkt. No. 40).)
> 12    The Court's previous Order denying attorney fees requested by Harris, (Nov. 25 Order 7 (Dkt. No. 43)), does not control here. First, Harris had assigned all its rights arising out of the *Wright* litigation to National Union, and thus was not the party compelled to bring suit to secure coverage. Second, the previous Order addressed a discovery dispute and did not [*39] examine the parties' arguments for summary judgment, which reveal that the case does, in fact, involve a coverage dispute.

## B. Defendant's Motion for Summary Judgment on Plaintiff's Contractual Duties

Greenwich asks the Court to make the following findings as a matter of law: (1) National Union's policy with Harris enabled it to participate in Harris' defense, (2) National Union did participate in Harris' defense, (3) National Union has an obligation to pay for its participation, and (4) National Union's independent obligation is not affected by any allocation agreement. (Contract MSJ 1-2 (Dkt. No. 26).) The first two proposed findings are undisputed. The Court finds that National Union was entitled to participate in Harris' defense, and did in fact do so. (*See* Contract MSJ Resp. 1 (Dkt. No. 35).) These findings, however, do not lead to the conclusion that National Union's participation as an excess insurer somehow relieved Greenwich of its duty to pay any further defense costs as the primary insurer.

Greenwich states that its motion, "requests no more than this—that the Court should make the legal determination that coverage is available under [National Union's policy], and that the issue [*40] of the amount of indemnity owed by [National Union] should go to the jury." (Contract MSJ Reply 6 (Dkt. No. 40).) The Court denies these requests. First, the Court's finding that National Union is entitled to reimbursement according to the terms of the allocation agreement disposes of Greenwich's request to send this issue to the jury. Second, as will be discussed below, whether National Union's policy provided coverage *to Harris* for costs associated with its

participation is neither relevant nor determinative of the issues presented in this case. Ultimately, Greenwich's motion rests on the flawed assumption that National Union's participation, through agreed upon counsel, abrogated Greenwich's primary duty to pay Harris' defense costs. [13]

> 13    Greenwich describes the instant motion as requesting "a ruling on summary judgment that it owes no contractual duty to pay the outstanding defense costs." (MSJ Resp. 5-6 (Dkt. No. 34).)

As an initial matter, Greenwich has no legal basis to rely on the insurance contract between National Union and Harris to address its contractual duty to defend—the issue in this lawsuit. Greenwich is not a party to National Union's policy with Harris, and has no justification [*41] to rely on the policy's provisions in determining its independent contractual duty to pay for Harris' defense. Unlike National Union, Greenwich is not an assignee of Harris and therefore cannot assert Harris' rights under National Union's policy. Similarly, Greenwich has made no payments on behalf of Harris for which another is primarily liable such that it could assert a subrogation claim. Absent status as an assignee or subrogee, Greenwich has no basis to assert Harris' contractual rights.

The relevant contractual issues presented in this lawsuit involve whether Greenwich's refusal to pay the outstanding costs of Harris' defense breached its contractual duty to Harris or an allocation agreement with National Union. [14] The provisions of National Union's excess policy are not relevant to these determinations because "an insurer who has a contractual duty to defend continues to have that duty *regardless of the existence of other insurance,* and may be liable for breach of contract for wrongfully refusing to aid in that defense." *Valley Ins. Co. v. Wellington Cheswick, LLC,* No. C05-1886RSM, 2007 U.S. Dist. LEXIS 7244, 2007 WL 858362, at *1 (W.D. Wash. 2007)* (emphasis added); *see W. Pac. Ins.,* 416 P.2d at 472 (insurer [*42] has a direct contractual obligation to its insured regardless of the existence of other insurance); *Clow v. Nat'l Indem. Co.,* 54 Wn.2d 198, 339 P.2d 82, 87 (Wash. 1959) (same). In *Western Pacific,* the Washington Supreme Court held that the excess insurer, Western, was entitled to reimbursement for the costs of defending the insured against a claim for which the primary insurer, Farmers, was liable. *416 P.2d at 472.* There, Western undertook the costs of defense pursuant to a contractual duty to defend provided in its excess policy. *Id.* Nevertheless, the court found that because Farmers was the primary insurer on the claim, it was "liable for the costs of the defense" and Western was entitled to reimbursement. *Id.* The court explained that because Farmer's obligations "were outstanding regardless of the existence of other insurance,"

it could not "stand aloof from the pending lawsuit upon the basis of a unilateral determination that the provisions and exclusions of its policy might relieve it of liability." *Id.* Under similar reasoning, Greenwich was not entitled to stop paying for its insured's defense based on its unilateral determination that National Union's participation absolved it of a duty to [*43] pay defense costs.

> 14   In this suit, National Union, as an assignee of Harris, alleges breach of insurance contract, bad faith, and violation of the Washington Consumer Protection Act. (Compl. PP 25-36 (Dkt. No. 1).) In addition, National Union alleges its own claims for breach of the allocation contract and equitable subrogation. (*Id.* at PP 37-45.) In its Answer, Greenwich asserted affirmative defenses to these claims but did not assert any counterclaims. (*See* Ans. (Dkt. No. 8).)

Greenwich asserts that National Union's policy requires it to pay the costs of defense because it participated in Harris's defense. (Contract MSJ 3 (Dkt. No. 26).) National Union's policy provides:

> [W]e will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the Insured. We will, however have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any Occurrence, which in our opinion, may create liability on our party under the terms of this policy. If we exercise such right, we will do so at our own expense.

(Pl. Ins. Policy 2 (Dkt. No. 26-2 at [*44] 7).) But insurance policies cannot be interpreted in a vacuum and must instead be interpreted "in light of the total insuring intent of all the parties" and in consideration of "the nature and purpose of primary and excess insurance policies." *Safeco Ins. Co. of Ill. v. Auto. Club Ins. Co., 108 Wn. App. 468, 31 P.3d 52, 57 (Wash. 2001).* The purpose of this clause is to protect National Union's right to participate in the defense and *protect the insured* from bearing any additional costs as a result of such participation. Even assuming, *arguendo,* that National Union's policy created an obligation vis-a-vis Greenwich to pay any additional costs associated with its participation, the enforceable allocation agreement between the insurers accounts for these costs. The clause does not, however, suspend Greenwich's duty to pay any further defense costs merely because National Union exercised its right to participate in the defense.

In addition, Greenwich's attempt to rely on National Union's excess policy to relieve Greenwich of its obligation to pay defense costs ignores the fundamental difference between primary and excess insurance coverage. Under Washington law, it is "well established that the liability [*45] of the excess insurer does not arise until after the limits of the coverage under the primary policy have been exceeded." *Millers, 665 P.2d at 890; U.S. Fire Ins. Co. v. Roberts & Schaefer Co., 37 Wn. App. 683, 683 P.2d 600, 603 (Wash. Ct. App. 1984)* ("[T]he excess insurer's duty to defend does not arise until the primary insurer has exhausted its obligation."); *Truck Ins. Exch., 887 P.2d at 458* (same). In *Millers,* the Washington Supreme Court affirmed the subrogation award of an excess insurer, Pemco, against the primary insurer, *Millers. 665 P.2d at 890.* Millers had argued that Pemco's payment of the insured's liability was in satisfaction of Pemco's separate obligations under the excess policy, thereby relieving Millers of liability. *Id.* The court flatly rejected this argument as ignoring "the responsibilities and relationships of the two insurers," and found that because Millers was primarily liable, Pemco was entitled to reimbursement. *Id.* Here, the Court rejects Greenwich's similar attempt to abandon its contractual duty, as the primary insurer, to its insured by relying on purported obligations owed by the excess insurer. National Union's obligations to Harris did not suspend or affect Greenwich's [*46] independent duties under its primary insurance policy with Harris or its allocation agreement with National Union. Greenwich's motion for summary judgment on National Union's contractual duties is therefore DENIED.

## C. Defendant's Motion for Summary Judgment on the Issue of Bad Faith

Greenwich requests that this Court find that National Union cannot prevail on its bad faith claim as a matter of law. (Bad Faith MSJ 1 (Dkt. No. 25).) To establish a bad faith claim, a plaintiff must present evidence that the insurer's action was "unreasonable, frivolous, or unfounded." *Kirk v. Mt. Airy Ins. Co., 134 Wn.2d 558, 951 P.2d 1124, 1126 (Wash. 1998).* The determination of whether an insurer acted in bad faith is a question of fact. *Smith v. Safeco Ins. Co., 150 Wn.2d 478, 78 P.3d 1274, 1277 (Wash. 2003).* An insurer is entitled to dismissal of a bad faith claim on summary judgment "only if there is no disputed material facts pertaining to the reasonableness of the insurer's conduct under the circumstances." *Id.* The Court's finding that Greenwich breached its contractual duty to defend Harris when it stopped paying for Harris' defense is dispositive of the instant motion. Greenwich's breach of its contractual duty to defend Harris [*47] raises sufficient issues of material fact on the reasonableness of its conduct to preclude summary judgment dismissal of National Union's bad faith claim.

Greenwich's motion for summary judgment on the issue of bad faith is therefore DENIED.

## III. CONCLUSION

For the foregoing reasons, the Court hereby finds and rules as follows:

> (1) Plaintiff's Motion for Summary Judgment (Dkt. No. 29) is hereby GRANTED. The Court finds that (a) Greenwich breached its duty to defend Harris, (b) National Union is entitled to reimbursement under equitable subrogation, and (c) Greenwich and National Union formed an enforceable contract on the allocation of the costs for Harris' defense, which includes the term that Greenwich will pay defense costs at hourly billing rates of $ 235/Partner, $ 220/Associate, and $ 110/Paralegal. Therefore, National Union is entitled, pursuant to the allocation agreement and equitable subrogation, to reimbursement for the costs of defense according to the terms of the allocation agreement. In addition, National Union is entitled to prejudgment interest on such reimbursement, and National Union is entitled to reasonable attorney fees.

> (2) Defendant's Motion for Summary Judgment [*48] on Contractual Duties (Dkt. No. 26) is hereby DENIED.

> (3) Defendant's Motion for Summary Judgment on the Issue of Bad Faith (Dkt. No. 25) is hereby DENIED.

SO ORDERED this 2nd day of February, 2009.

/s/ John C Coughenour

John C. Coughenour

UNITED STATES DISTRICT JUDGE

# EXHIBIT D



® LexisNexis®

**Steadfast Insurance Co. v. The Purdue Frederick Co. et al.**

**X08CV020191697S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF STAM-
FORD-NORWALK, COMPLEX LITIGATION DOCKET, AT STAMFORD**

*2005 Conn. Super. LEXIS 3472*

**December 6, 2005, Decided
December 6, 2005, Filed**

**NOTICE:** [*1] THIS DECISION IS UNRE-
PORTED AND MAY BE SUBJECT TO FURTHER
APPELLATE REVIEW. COUNSEL IS CAUTIONED
TO MAKE AN INDEPENDENT DETERMINATION
OF THE STATUS OF THIS CASE.

**SUBSEQUENT HISTORY:** Summary judgment denied
by *Steadfast Ins. Co. v. Purdue Federick Co., 2006
Conn. Super. LEXIS 1089 (Conn. Super. Ct., Apr. 10,
2006)*

**PRIOR HISTORY:** *Steadfast Ins. Co. v. Purdue Fred-
erick Co., 2005 Conn. Super. LEXIS 3287 (Conn. Super.
Ct., Nov. 30, 2005)*

**JUDGES:** TAGGART D. ADAMS, SUPERIOR
COURT JUDGE.

**OPINION BY:** TAGGART D. ADAMS

**OPINION**

*MEMORANDUM OF DECISION RE SUMMARY
JUDGMENT MOTION (414.00)*

The defendant-insured the Purdue Frederick Com-
pany (Purdue) has moved for partial summary judgment
and an order that, because of conflicts of interest, the
plaintiff-insurer Steadfast Insurance Company (Stead-
fast) may not choose counsel for, nor control settlement
of, the multitude of cases in which Purdue is being sued
for injuries and losses allegedly caused by Purdue's
pharmaceutical product, OxyContin (OxyContin cases).

Purdue has identified two conflicts of interest with
Steadfast which Purdue contends legally prevent Stead-
fast from controlling Purdue's defense of the OxyContin
cases. First, is the fact that the commercial general liabil-
ity insurance contract between Purdue and Steadfast
contains an indemnity payment limit of $ 2 million but
no dollar limitation on the cost of defense Steadfast is
obligated to provide. In the circumstances presented in
this case where (1) a large number [*2] of OxyContin
cases have been filed and another large number of puta-
tive plaintiffs have signed tolling agreements and (2)
Purdue believes it has strong defenses to liability in these
cases, Purdue contends that Steadfast has a strong finan-
cial incentive to choose defense counsel and control set-
tlement so as to exhaust the limits of liability under the
policy and terminate its duty to defend long before the
defense costs far exceed the liability limits. Defense
costs, according to Purdue, now exceed $ 300 million.

The second conflict identified by Purdue is the alle-
gation by Steadfast in this declaratory judgment action
that the alleged injuries to the plaintiffs in the OxyContin
cases were the expected or intended result of the sale of
OxyContin and therefore not covered by the Steadfast
policy. The existence of this allegation, according to
Purdue, puts Steadfast directly at odds with the interests
of Purdue, its insured, and aligns Steadfast's interests
with those of the plaintiffs in the OxyContin cases, who,
make the safe allegation.

Steadfast opposes the motion with several legal ar-
guments pointing out, among other things, that the in-
surance agreement specifically allocates [*3] the right
of settlement and choice of counsel to it, and that Con-
necticut law obviates the conflict of interest issue by
making clear that an attorney appearing for an insured

has the insured as his or her sole client regardless of the source of the attorney's reimbursement or who selected the attorney.

In addition, Steadfast argues that Purdue has not met its burden of showing an absence of any disputed material facts. See *Appleton v. Board of Education, 254 Conn. 205, 209, 757 A.2d 1059 (2000)*. Despite the fact that the court perceives the questions of the existence and consequences of a conflict of interest to be largely legal questions, this contention is correct.

While the parties and this court have not identified any controlling Connecticut cases, and for that matter very few cases at all, on the issue of insurer conflict of interest as raised by Purdue there is some persuasive force to Purdue's legal arguments. But summary judgment may not be granted in a vacuum and these issues must be considered in the context of the relationship between Purdue and Steadfast and in the context of the OxyContin cases. In these areas, the court finds that Purdue has not carried [*4]  its burden of establishing the absence of uncontested material facts. For instance, Purdue and Steadfast negotiated over the terms of Special Claims Handling Instructions (SCHI) in connection with the liability insurance including terms relating to which party had authority to choose defense counsel on

claims covered by the policy. The history of these negotiations and their outcome is unknown to the court, but might shed light on whether a conflict of interest exists and, if so, whether the negotiated outcome constitutes a waiver. Similarly, the events in the months or even years leading to Steadfast's delivery of $ 2 million to Purdue with the claim that it exhausted the policy while adverted to in papers filed in court are not set out by affidavit in any complete fashion. These events, which may or may not involve controverted facts, are critical to illuminating the issue of whether a conflict existed, or existed from that point forward, or existed prior to that event.

The court does not believe that a viable claim of conflict of interest necessarily requires proof that injury has occurred, nor that bad motive or intent be present. However, the party seeking summary judgment is [*5] required to show through uncontested material facts the background in which the requested relief is sought and why that background supports the arguments for such relief. Purdue has not met that burden.

The motion for summary judgment is denied.

TAGGART D. ADAMS

SUPERIOR COURT JUDGE